**IN THE UNITED STATES COURT OF APPEALS**
**FOR THE FIFTH CIRCUIT**

United States Court of Appeals
Fifth Circuit

**F I L E D**
September 9, 2009

Charles R. Fulbruge III
Clerk

No. 07-20817

HOUSTON INDEPENDENT SCHOOL DISTRICT

Plaintiff - Appellee-Cross-Appellant

v.

VP by next friend, Juan and Sylvia P

Defendant - Appellant-Cross-Appellee

Appeal from the United States District Court
for the Southern District of Texas
USDC No. 4:05-CV-1686

ON PETITION FOR REHEARING

(Opinion 4/23/09, 5th Cir., 566 F.3d 459)

Before BENAVIDES, SOUTHWICK, and HAYNES, Circuit Judges.

LESLIE H. SOUTHWICK, Circuit Judge:

No member of the panel nor judge in regular active service of the court having requested that the court be polled on Rehearing En Banc (Fed. R. App. P. and 5th Cir. R. 35), the Petition for Rehearing En Banc is DENIED. We also deny Panel Rehearing but withdraw our prior opinion, issued on April 23, 2009, and substitute the following.

The Houston Independent School District (HISD) initiated the present action in the district court as an appeal of an administrative decision that HISD

had denied a child a free appropriate public education. The relevant statute is the Individuals with Disabilities Education Act (IDEA), 20 U.S.C. § 1400 *et seq.* Reimbursement for a year of private school placement was awarded. The district court affirmed the decision. The court denied reimbursement for the private school placement during a second school year that occurred during the pendency of the proceedings. Both parties were aggrieved and appeal. We AFFIRM as to the reimbursement for the first school year, REVERSE and RENDER as to the second year, and REMAND for further proceedings as to attorney's fees.

## I. FACTUAL AND PROCEDURAL BACKGROUND

The child whose needs are at the center of this dispute is referred to as V.P. to protect her privacy. At the time of the administrative hearing, V.P. was an eight-year-old student within the jurisdictional boundaries of HISD. V.P. qualified as a child with a disability entitled to receive special education services under the IDEA due to her auditory and speech impairments. HISD first identified V.P. as a child eligible for special education when she was four years old. Accordingly, HISD placed V.P. in the Preschool Program for Children with Disabilities at Garden Oaks Elementary. It developed an individualized education plan (IEP) to address her language delays. After three weeks at Garden Oaks, V.P.'s mother obtained a transfer for her daughter to Wainwright Elementary School, where V.P.'s mother was employed. V.P. remained in a regular education, pre-kindergarten classroom at Wainwright Elementary for the remainder of the 2001-2002 school year.

*A.    2002-2003 School Year*

In 2002, V.P. began kindergarten in a regular education classroom at Wainwright. In October 2002, an Admission, Review, and Dismissal Committee ("IEP Committee" or "Committee")[1] met to develop an IEP for V.P.'s

---

[1] In Texas, those who prepare an IEP are known as an Admissions, Review, and Dismissal Committee. *Cypress-Fairbanks Indep. Sch. Dist. v. Michael F.*, 118 F.3d 245, 247

kindergarten year. The IEP Committee continued the identification of V.P. as a child with a speech impairment and approved two hours per week of speech therapy, along with classroom modifications. In the spring of 2003, V.P.'s parents obtained hearing aids for V.P., including a pair of loaner hearing aids in February 2003 and her own custom aids in May 2003.

In May 2003, V.P.'s IEP Committee met to evaluate V.P.'s progress under her current IEP and to prepare for the next school year. The Committee considered whether V.P. had a hearing impairment that would qualify her for special education services as a student with an auditory impairment. Finding that she did, it developed an IEP for audiological management for the 2003-2004 school year recommending that V.P. remain in a regular education classroom with modifications and teaching strategies designed to accommodate her hearing impairment. The Committee continued V.P.'s identification as a child with a speech impairment and continued two hours of speech therapy per week. Additionally, in May 2003, V.P. was provided with an FM loop system in her classroom for the last week of her kindergarten year.

B.     *2003-2004 School Year*

In October 2003, which was six weeks into V.P.'s first-grade year, her IEP Committee was convened to review her IEP in light of concerns expressed by V.P.'s mother and also by her classroom teacher, Ms. Williams, regarding V.P.'s academic performance and progress and whether a more restrictive educational placement was needed. The Committee continued V.P.'s identification as a child with auditory and speech impairments. The Committee further determined that

---

(5th Cir. 1997). The IEP Committee includes the parents of the child with a disability, at least one of the child's regular education teachers, at least one special education teacher, a qualified representative of the school district (the local educational agency), an individual who can interpret "the instructional implications of evaluation results," other individuals who have knowledge or special expertise regarding the child (included at the discretion of the parent or agency), and, when appropriate, the child with a disability. 20 U.S.C. § 1414(d)(1)(B); *see also Michael F.*, 118 F.3d at 247.

V.P. should remain in a regular education classroom, but it approved the implementation of additional special education services and modifications within the regular education setting, including in-class support, frequent breaks, content mastery,[2] and speech therapy. In addition to other recommendations, it requested additional testing, including a new audiological evaluation, new achievement testing, and an observation by an auditory impairment specialist.

The IEP Committee met again in January 2004 to discuss V.P.'s progress and the results of the additional testing. The Committee continued V.P.'s classification as a child with auditory and speech impairments. She would remain in the regular education classroom. The Committee continued V.P.'s placement in two hours of speech therapy per week and approved additional classroom modifications, including amplification, visual cues, having the teacher try to face V.P., preferential classroom seating, and questioning to check understanding. The Committee also developed an IEP to address V.P.'s language and listening skills. Under this IEP, an itinerant teacher for the auditory-impaired was to work with V.P. for one hour per week. Additionally, the Committee incorporated Earobics computer software as a special education service to address V.P.'s auditory-processing weakness.[3] The Committee requested a new speech and language assessment.

In May 2004, V.P.'s IEP Committee met to evaluate V.P.'s progress and consider her placement for V.P.'s second-grade year, starting that fall. The Committee continued V.P.'s identification as a child with auditory and speech impairments. It then developed an IEP for the remainder of the 2003-2004

---

[2] Content mastery is a special education service in which students obtain additional assistance or modifications from a special education teacher outside of the general education classroom.

[3] Earobics is a computer software program that helps children develop phonological awareness and auditory processing tools, which serve as foundational skills for learning to read.

school year and the full 2004-2005 school year. For 2004-2005, which was V.P.'s second-grade year, the Committee recommended that V.P. remain in a regular education classroom with special education and related services similar to those provided during the prior school year, including two hours per week of speech therapy, one hour per week with the itinerant teacher for the auditory-impaired, amplification, visual cues, teacher facing student, preferential classroom seating, and questioning to test understanding. V.P.'s mother disagreed with the proposed IEP for 2004-2005 and indicated that she wished to withdraw V.P. from HISD and place her in a private institution. The Committee held a "recess meeting" in an effort to resolve the situation, but V.P.'s parents ultimately decided to withdraw V.P. one week before the end of the 2003-2004 school year.

*C.    2004-2005 School Year*

In September 2004, V.P.'s parents enrolled V.P. in a kindergarten/first-grade class at the Parish School, a private school for children with language-learning disabilities. At the Parish School, V.P. was in a small classroom with ten students, a teacher, and an assistant teacher. Through the Parish School, V.P. also worked with the Carruth Center, which provided language services to Parish School students. V.P. received ten hours of group speech/language therapy per week. Speech pathologists provided therapy addressing V.P.'s receptive and expressive language skills. V.P. also received phonemic awareness training, auditory memory training, and gap-detection training through the Fast ForWord computer program. Additionally, the Parish School attempted to minimize V.P.'s exposure to ambient noise whenever possible in an effort to promote noise desensitization. V.P.'s Parish School curriculum also included sequencing exercises to improve her auditory-processing skills.

In addition to the 2004-2005 school year, V.P. remained at the Parish School for the 2005-2006 school year during the district court's review of the hearing officer's decision. No issues regarding later years are raised.

*D. Procedural History*

In August 2004, V.P.'s parents requested a special education due process hearing before the Texas Education Agency to address whether HISD failed to provide V.P. with a free appropriate public education, failed to develop or implement IEPs reasonably calculated to provide V.P. with educational benefit, and failed to consider an appropriate placement for V.P. The Texas Education Agency hearing officer held a due process hearing in December 2004 and issued a decision in February 2005. The hearing officer concluded that V.P. has extensive language development and auditory-processing problems stemming from sensory hearing loss and an auditory-processing disorder. The hearing officer found that V.P. requires auditory training, memory training, phonemic awareness training, noise desensitization, sequencing ability training, gap-detection training, onset-time training, visual instruction, and an FM loop system to meet her educational needs. The hearing officer concluded that HISD failed to include many of these necessary services in V.P.'s IEPs, including noise desensitization training, gap-detection training, and sequencing training. Ultimately, the hearing officer determined that HISD did not provide V.P. with a free appropriate public education and that the Parish School was an appropriate placement for V.P. Accordingly, the hearing officer awarded V.P.'s parents reimbursement for V.P.'s 2004-2005 placement at the Parish School.

In May 2005, HISD appealed the hearing officer's decision to the district court. V.P. filed an answer and counterclaim in June 2005, appealing the hearing officer's decisions on the issues for which she did not prevail at the due process hearing. V.P.'s answer and counterclaim did not specifically seek payment for V.P.'s 2005-2006 placement at the Parish School. In September 2005, during a Rule 16 scheduling hearing, V.P. informed the court that she intended to introduce evidence in addition to the administrative record for the

district court's consideration on appeal.[4] Months later, in June 2006, V.P. filed a motion to submit additional evidence in which she indicated that she intended to introduce reimbursement evidence regarding the costs of V.P.'s placement at the Parish School for the 2005-2006 school year.

In March 2007, the district court granted partial summary judgment in V.P.'s favor. The court affirmed the hearing officer's determination that HISD failed to provide V.P. with a free appropriate public education, failed to develop educationally beneficial IEPs, and failed to consider an appropriate placement for V.P. It further affirmed the hearing officer's decision that V.P. is entitled to reimbursement for the 2004-2005 Parish School placement. With respect to the 2005-2006 Parish School costs, the court refrained from addressing that issue because V.P. had not moved for summary judgment on it.

The court then requested additional record development regarding the appropriate amount of reimbursement to be awarded. The parties stipulated that $16,125.30 was the proper reimbursement for the 2004-2005 school year and the amount would also be appropriate should reimbursement for the 2005-2006 placement be awarded. After the filing of cross motions for summary judgment, the Court denied reimbursement for the 2005-2006 school year.

V.P. now appeals, arguing that the district court erred in failing to award reimbursement for V.P.'s 2005-2006 Parish School placement and the attorney's fees and costs expended in seeking such reimbursement. HISD has filed a cross-appeal alleging that the district court erred in concluding that it failed to provide V.P. with a free appropriate public education.

## II. DISCUSSION

---

[4] The IDEA provides that a court reviewing a state hearing officer's decision "(i) shall receive the records of the administrative proceedings; (ii) shall hear additional evidence at the request of a party; and (iii) basing its decision on the preponderance of the evidence, shall grant such relief as the court determines is appropriate." 20 U.S.C. § 1415(i)(2)(C).

## A. *Free Appropriate Public Education*

When a district court reviews a hearing officer's decision under the IDEA program, it receives the records of the administrative proceedings and also takes additional evidence at the request of any party. "Although the district court must accord 'due weight' to the hearing officer's findings, the court must ultimately reach an independent decision based on a preponderance of the evidence." *Cypress-Fairbanks Indep. Sch. Dist. v. Michael F.*, 118 F.3d 245, 252 (5th Cir. 1997) (citations omitted); *see also* 20 U.S.C. 1415(i)(2)(C); *Bd. of Educ. of the Hendrick Hudson Cent. Sch. Dist., Westchester County v. Rowley*, 458 U.S. 176, 205–07 (1982). Thus, the district court's review is "virtually *de novo*." *Michael F.*, 118 F.3d at 252.

We, in turn, review a district court's decision concerning the propriety of a local school district's IEP and the need for an alternative placement *de novo* as a mixed question of law and fact. *Id.* "The district court's findings of underlying fact, such as findings that a disabled student obtained educational benefits under an IEP, are reviewed for clear error." *Id.* (citation omitted). The clear error standard of review "precludes reversal of a district court's findings unless [the court is] left with a definite and firm conviction that a mistake has been committed." *Jauch v. Nautical Servs., Inc.*, 470 F.3d 207, 213 (5th Cir. 2006) (internal quotation marks and citation omitted). The party challenging the appropriateness of an IEP bears the burden of demonstrating that the IEP and resulting placement were inappropriate under the requirements of the IDEA. *Id.* (citation omitted).

One of the primary purposes of the IDEA is to ensure that children with disabilities receive a "free appropriate public education that emphasizes special education and related services designed to meet their unique needs and prepare them for further education, employment, and independent living." 20 U.S.C. § 1400(d)(1)(A). As "a local educational agency responsible for complying with the

IDEA as a condition of the State of Texas'[s] receipt of federal education funding," HISD must "(1) provide each disabled child within its jurisdictional boundaries with a 'free appropriate public education' tailored to his unique needs, and (2) assure that such education is offered . . . in the least restrictive environment consistent with the disabled student's needs." *Michael F.*, 118 F.3d at 247 (citations omitted). These requirements are implemented through HISD's development of IEPs for its disabled students. *Id.* Through a child's IEP, HISD must provide a "basic floor of opportunity" that "consists of access to specialized instruction and related services which are individually designed to provide educational benefit to the [disabled] child." *Rowley*, 458 U.S. at 201. HISD need not provide its disabled students with the best possible education, nor one that will maximize the student's educational potential. *Michael F.*, 118 F.3d at 247 (citing *Rowley*, 458 U.S. at 188–89). "Nevertheless, the educational benefit to which the Act refers and to which an IEP must be geared cannot be a mere modicum or *de minimis*; rather, an IEP must be likely to produce progress, not regression or trivial educational advancement." *Id.* at 248 (internal quotation marks and citation omitted). In short, HISD must provide its students with "meaningful" educational benefit. *Id.*

When a parent challenges the appropriateness of an IEP, a reviewing court's inquiry is twofold. The court must first ask whether the state has complied with the procedural requirements of the IDEA, and then determine whether the IEP developed through such procedures was "reasonably calculated to enable the child to receive educational benefits." *Rowley*, 458 U.S. at 206–07. If the court finds that the state has not provided an appropriate educational placement, the court may require the school district to reimburse the child's parents for the costs of sending the child to an appropriate private school or institution. *Town of Burlington, Mass. v. Dep't of Educ. of Mass.*, 471 U.S. 359, 369–70 (1985); *Michael F.*, 118 F.3d at 248. Reimbursement may be ordered

only if it is shown "that (1) an IEP calling for placement in a public school was inappropriate under the IDEA, and (2) the private school placement . . . was proper under the Act." *Michael F.*, 118 F.3d at 248 (citations omitted).

HISD argues that the district court erred in concluding that it failed to provide V.P. with a free appropriate public education. Despite V.P.'s disabilities, HISD asserts she was receiving a meaningful educational benefit, including earning a promotion from first to second grade under the same standards that apply to non-disabled first graders. HISD further contends that the IDEA does not require it to provide V.P. with an education designed to remediate her disability or to ensure optimal performance, and it maintains that the district court erred in concluding that it should have implemented every aspect of the program recommended by V.P.'s expert witness.

We have set out four factors that serve as "indicators of whether an IEP is reasonably calculated to provide a meaningful educational benefit under the IDEA," and these factors are whether "(1) the program is individualized on the basis of the student's assessment and performance; (2) the program is administered in the least restrictive environment; (3) the services are provided in a coordinated and collaborative manner by the key 'stakeholders'; and (4) positive academic and non-academic benefits are demonstrated." *Id.* at 253; *see also Adam J. ex rel. Robert J. v. Keller Indep. Sch. Dist.*, 328 F.3d 804, 810 (5th Cir. 2003). Both the hearing officer and the district court found that all of these considerations militated in favor of finding that HISD failed to provide V.P. with a free appropriate public education. We will deferentially review the district court's fact findings with respect to each of these factors. We will also give *de novo* consideration to any legal issues that arise under each.

> *1. Individualized program on the basis of V.P.'s assessment and performance*

The district court found that V.P.'s IEPs were not sufficiently individualized to her needs. The court pointed to these deficiencies: as of May 2004, more than a year after V.P.'s IEP Committee recommended an audiological evaluation, the evaluation still had not been completed; V.P.'s IEPs were not specific enough with regard to V.P.'s auditory-processing or audiological deficiencies because they lacked strategies to assist with sequencing, gap detection, and noise desensitization; although the Committee recognized that V.P.'s most significant problems were speech and language deficiencies due to hearing loss, it did not integrate special education sessions with a teacher for hearing-impaired students until January 2004; and the Committee did not address problems that developed with V.P.'s FM loop system in September 2003.

HISD argues that each of the bases for the district court's finding are erroneous. Initially, it asserts that a school district is not required to furnish every special service necessary to maximize a child's potential. Consequently, HISD's failure to provide V.P. with sequencing training, gap detection, and noise desensitization did not render V.P.'s IEP inadequate. Instead, HISD maintains that these services were programs suggested by V.P.'s expert witness to remediate V.P.'s speech and auditory-processing disorder, and the fact that HISD failed to provide these services does not mean that V.P.'s needs were not being addressed. HISD further maintains that it should not be penalized for failing to include an explanation concerning the problems with V.P.'s FM loop system in the IEP Committee minutes. HISD points out that the problem was caught and corrected, and there is no requirement that the Committee's notes include all issues that arise on a day-to-day basis.

V.P.'s IEP included several accommodations and modifications to address her general speech and auditory impairments, such as limited speech therapy (two hours per week), visual cues, preferential classroom seating, questioning to check understanding, an FM loop system, content mastery classes, and

11

limited instruction by an itinerant teacher for the auditory impaired (one hour per week). However, these services failed adequately to address V.P.'s distinct auditory-processing disorder.

V.P.'s expert witness, Dr. Ray Battin, a neuropsychologist and audiologist, testified that he performed an advanced audiological evaluation on V.P. in October 2004. Battin's evaluation revealed that V.P. has moderate to severe sensory hearing loss and severe auditory-processing problems. To address these problems, Battin explained that V.P. requires noise desensitization, sequencing training, and gap-detection work and that V.P.'s May 2004 IEP did not address those needs. Battin noted that although the May 2004 IEP was good for V.P.'s expressive language delay problems, it was inappropriate to address her auditory-processing disorder. In fact, Battin testified that V.P. needed a separate IEP for her auditory-processing disorder.

In light of Battin's testimony, we find no clear error with the district court's finding that noise desensitization, sequencing training, and gap-detection work were necessary to address V.P.'s specific auditory-processing problems. Further, there was evidence to support that they were not offered merely as a means of maximizing her potential or making her more competitive with the other members of her class. Based on the valid fact-finding concerning what was necessary to address her auditory needs, and applying our *de novo* review, we accept that her IEP was insufficiently individualized.

*2. Program administered in the least restrictive environment*

The IDEA requires that children with a disability be provided a free appropriate public education in the least restrictive environment:

> To the maximum extent appropriate, children with disabilities . . . [should be] educated with children who are not disabled, and special classes, separate schooling, or other removal of children with disabilities from the regular educational environment [should occur] only when the nature or severity of the disability of a child is such

that education in regular classes with the use of supplementary aids and services cannot be achieved satisfactorily.

20 U.S.C. § 1412(a)(5)(A).

The district court concluded that V.P.'s IEP did not provide her with sufficient supplementary services to be successful in the general education classroom. In reaching this conclusion, the court explained that it was not concerned with whether V.P. was mainstreamed to the maximum extent possible; instead, it was addressing whether V.P. was mainstreamed beyond her capabilities. The court noted several deficiencies in V.P.'s ability to benefit satisfactorily from her education in the regular classroom, including her failure to attend content mastery training after the fall of 2003. There was evidence that although V.P. paid attention to the teacher's portion of a lesson, she was unable to participate in the group portion of a lesson. Further, she could remain focused on her assignment only for short periods of time without redirection. The court also explained that V.P.'s FM system did not allow her the benefit of class discussion. There is no record evidence that the proposed solution to this problem (having the teacher pass the microphone around the class during discussion) was ever implemented. The court also noted that when the loop component of the system was unavailable, V.P.'s use of headphones further limited her ability to hear her classmates and participate in class discussions. Finally, the court pointed out that after V.P. lost her hearing aids on the playground, she regularly took them off before going out for recess. Nothing in the record suggests that the IEP Committee attempted to address this problem with V.P. or her parents. Thus, V.P. was restricted in her ability to communicate and socialize with other students during recess.

Without conceding the point, HISD maintains that even if the district court was correct in finding V.P.'s placement improper, the appropriate remedy would be to require the school to provide additional supplementary aids and

services in the general education environment or to allow V.P. to attend a combination of regular and special education classes. Additionally, HISD contends that because of the nature of V.P.'s disability, exposure to the language models of non-disabled peers is important to V.P.'s progress.

V.P.'s regular education placement was certainly a less restrictive environment than her Parish School placement. However, the IDEA mandates that a child be placed in the least restrictive environment in which the child can achieve an *appropriate* education. *See* 20 U.S.C. § 1412(a)(5)(A). The IDEA's strong preference in favor of mainstreaming must "be weighed in tandem with the Act's principal goal of ensuring that the public schools provide [disabled] children with a free appropriate public education." *Daniel R.R. v. State Bd. of Educ.*, 874 F.2d 1036, 1044–45, 1048 (5th Cir. 1989) (internal quotation marks and citation omitted).

Though HISD tried to accommodate V.P. in a regular education classroom, the district court concluded that V.P. was not receiving a meaningful educational benefit from such placement. Although exposure to the language models of V.P.'s non-disabled peers is important, V.P.'s interaction with her peers within the regular education classroom was significantly limited. Under the FM loop system, only V.P.'s teacher wore a microphone. Accordingly, V.P. was not receiving amplification of her peers during class and group discussions. Additionally, because V.P. removed her hearing aids during recess, she was not able to interact effectively with her peers during a significant portion of her time outside of class. The district court's fact-finding regarding the difficulties that arose due to her placement in the general classroom, including that there were insufficient supplemental services, is not clearly erroneous. Applying a *de novo review,* we agree that V.P.'s IEP failed to provide her with the least restrictive environment appropriate to her condition.

*3. Coordinated and collaborative services provided by key stakeholders*

The district court concluded that the services HISD provided V.P. were not coordinated and collaborative. The court explained that although V.P.'s IEP Committee meetings were well attended and generally included the key stakeholders, the participants failed to communicate and collaborate outside of the meetings. For example, the special education chair never discussed V.P.'s progress with her classroom teacher outside of the meetings, and V.P.'s classroom teacher never discussed V.P.'s progress with V.P.'s writing teacher or other school staff outside of the Committee meetings. Furthermore, when V.P.'s classroom teacher missed a meeting in January 2004, the record does not reflect that anyone informed her of the modifications made in that meeting, even though their implementation required the teacher's involvement. Additionally, the special education chair instructed V.P.'s classroom teacher to modify V.P.'s regular tests and assignments, but no such modifications were adopted by the Committee.

The district court also noted that the HISD staff "struggled with training and followup." The court concluded that the one-page flyer provided to train school staff on working with hearing-impaired students was inadequate. Furthermore, the school nurse who was assigned to maintain V.P.'s FM system received little training and provided little training to the other staff members. The nurse did not attend the IEP Committee meetings and did not adequately communicate with others to repair V.P.'s FM loop system in a timely fashion. Finally, school staff did not follow up on V.P.'s failure to attend content mastery for more than two months or on an October 2003 Committee plan to try proposed modifications at Wainwright for thirty days before revisiting the possibility of placing V.P. in Sutton Elementary's oral deaf program.

HISD maintains that these isolated occurrences are insufficient to show that it failed to implement substantial or significant provisions of V.P.'s IEP, that the services it provided were sufficient to confer an educational benefit upon

15

V.P, and that the district court's determination that it failed to implement the content mastery provision of V.P.'s IEP is not supported by the record evidence. According to HISD, V.P.'s mother made the decision to prohibit V.P. from attending content mastery, and it could not force her to attend over her mother's instructions to the contrary. HISD further responds that the IEP Committee met multiple times during the school year to discuss V.P.'s progress and adjust her program accordingly, and that there was testimony from other teachers indicating that they communicated frequently about V.P., including testimony from V.P.'s classroom teacher that she often talked with V.P.'s mother and testimony from V.P.'s speech teacher that she worked closely with all of V.P.'s teachers.

"[A] party challenging the implementation of an IEP must show more than a *de minimis* failure to implement all elements of that IEP, and, instead, must demonstrate that the school board or other authorities failed to implement substantial or significant provisions of the IEP." *Houston Indep. Sch. Dist. v. Bobby R.*, 200 F.3d 341, 349 (5th Cir. 2000). What provisions are significant in an IEP should be determined in part based on "whether the IEP services that were provided actually conferred an educational benefit." *Id.* at 349 n.2.

The fact-findings by the district court that are fundamental to the conclusions on this factor are sound. First, we find no clear error that poor communication and collaboration between the Wainwright school nurse and others assigned to monitor the system led to the problems with the FM loop system being out of service for approximately two months. Furthermore, while the FM loop was broken, school personnel allowed V.P. to wear the alternative headphone system over her hearing aids. There was no error in finding that to be improper and potentially harmful. Further, there is evidence that the special education chair instructed V.P.'s classroom teacher to provide testing and assignment modifications without such modifications being included in V.P.'s

IEP. The special education chair's unilateral decision to change the IEP suggests a lack of coordination and collaboration with V.P.'s other key stakeholders. Next, it was not clearly erroneous for the court to find that the IEP Committee did not communicate effectively and collaborate to address V.P.'s failure to attend content mastery. Although there is evidence that V.P.'s mother made the decision to remove V.P. temporarily from the service, the school staff failed to follow up on V.P.'s extended absence. Finally, V.P.'s classroom teacher testified that in November 2003, V.P.'s one-on-one aide stopped coming to work with V.P. for approximately three to four weeks at the direction of the school principal, despite the fact that V.P.'s IEP called for one-on-one assistance.

In addition to problems with the implementation of V.P.'s IEP, the district court did not clearly err in finding that V.P.'s key stakeholders received inadequate training. Although the school provided its personnel with a one-page tip sheet for working with an auditory or speech impaired child, such minimal training was insufficient. Moreover, despite such training, V.P.'s classroom teacher, one of the most important stakeholders, explained that she was unable to communicate effectively with V.P. and evaluate her progress.

*4. Demonstration of positive academic and non-academic benefits*

Perhaps one of the most critical factors in this analysis is the final one. This factor seeks to determine whether the student was obtaining benefits from the IEP. *Michael F.*, 118 F.3d at 252. There are subordinate components of the fact-finding, perhaps best thought of as evaluating the validity of the various measures of the progress that were offered. It is difficult analytically to compartmentalize all the determinations as ones of fact and ones of law, but we will proceed to make that effort.

The district court concluded that V.P. made only minimal progress, and the benefits she received were not meaningful. The court noted that there was conflicting testimony regarding V.P.'s progress at Wainwright – V.P.'s mother

17

and classroom teacher were not encouraged by V.P.'s progress; V.P.'s speech therapist included both positive and negative impressions of V.P.'s advancement; and V.P.'s standardized speech and language test scores did not improve over time. The court explained that V.P. failed language arts and reading during the first two nine-weeks of the fall semester. Her grades then improved when her teacher implemented test and assignment modifications; however, her teacher testified that she would not have achieved passing grades without the modifications. Furthermore, although V.P. met the promotion standards for second grade, based on her grades with the modifications and the district standards for standardized testing with modifications, her classroom teacher testified that V.P. had not mastered the curriculum necessary to be successful in second grade.

HISD contends that V.P. demonstrated academic advancement because she achieved passing grades in her regular education program sufficient to advance to the next grade, her standardized scores show that she achieved the level of educational benefit required by the IDEA, and she mastered the high frequency words required for promotion. HISD maintains that the district court improperly considered V.P.'s standardized speech and language test scores. HISD notes that such scores are percentile scores that merely compare V.P.'s scores to those of other children who took the test, and V.P.'s development should be measured with respect to her individual progress, not her abilities in relation to the rest of the class. HISD also points to objective evidence indicating that V.P. was receiving an educational benefit from her HISD placement, arguing that V.P.'s speech and language skills suggested three years of progress in the three years she was in HISD, and achievement testing in November 2003 indicated that V.P. was performing at or near the first-grade level in most areas.

HISD further alleges that the IDEA does not require a school district to ensure that a disabled child is able to advance at a rate faster than non-disabled

peers. Even when a disabled child falls further behind her peers, she may still be receiving some educational benefit from the placement. HISD attributes V.P.'s speech therapist's equivocal responses regarding her progress to the requirement that the therapist assess both V.P.'s strengths and weaknesses in the classroom. HISD asserts that V.P.'s weaknesses show that V.P. continues to have a disability and do not indicate that she has not received a free appropriate public education. Finally, HISD argues that the testimony of V.P.'s teacher that V.P. would need modifications to perform well in second grade does not support the district court's conclusion that V.P.'s progress was minimal.

Urged strongly upon us as a controlling precedent, particularly in light of the point about test scores, is a 2000 decision of this court also involving HISD. *See Bobby R.*, 200 F.3d 341. In that case, we considered whether HISD provided a free appropriate public education to a student with speech disabilities. Only the third and fourth factors that we have discussed here were at issue in *Bobby R.*: were the services required in the child's IEP provided in a coordinated and collaborative manner, and had the child demonstrated academic and non-academic benefits from his IEP? *Id.* at 348. What is most relevant here is the discussion of this last factor. We will review our prior analysis.

We start with context. In applying *Bobby R.*, it is of some relevance that the court was considering whether the district court *clearly erred* in finding that a child *was* receiving a meaningful educational benefit. Here, the issue is whether the district court *clearly erred* in finding that V.P. *was not* receiving a meaningful educational benefit.

The student, Bobby R., argued that where he stood in relation to his non-disabled peers was the best measure of his academic performance, whereas HISD maintained that passing scores and advancement from grade to grade was the proper indicia of academic progress. *Id.* We sided with HISD:

a disabled child's development should be measured not by his relation to the rest of the class, but rather with respect to the individual student, as declining percentile scores do not necessarily represent a lack of educational benefit, but only a child's inability to maintain the same level of academic progress achieved by his non-disabled peers.

*Id.* The court pointed out that the test scores and grade levels in a number of subjects had improved during the child's years in HISD. *Id.* It concluded that the improvements were not trivial and that no clear error existed in the district court's factual determination that the child was receiving educational benefits from his IEP. 200 F.3d at 350. It was not necessary for the child "to improve in *every* area to obtain an educational benefit," as maximization of a disabled student's educational potential is not required. *Id.*

HISD argues that just as in *Bobby R.*, V.P. had improved test scores and advanced to a new grade level. Therefore, the district court is said to have erred in determining that she did not receive more than a minimal educational benefit from her IEP. Even though her test scores improved and she was advanced only after her teacher implemented modifications in her assignments and tests, HISD argues that such modifications are permitted under the IDEA. HISD also submits that a failure to master curriculum cannot be determined by comparing V.P.'s success to that of her non-disabled peers.

We find the district court's rulings on this fourth factor to be consistent with *Bobby R.* In the present case, passing grades and yearly advancement were not found to be adequate measures because V.P.'s teacher testified that the improved grades and advancement resulted from modifications the special education director unilaterally imposed. The IEP Committee itself never evaluated the changes and determined whether they were consistent with the requirements of the IDEA. V.P.'s teacher testified that V.P. *would not have*

made passing grades and advanced to a new grade-level without these unauthorized modifications.

Modifications to an IEP legally can and likely often must be made in response to the experiences of a child in the classroom. However, before acceptable test scores and advancement in class grade can be seen as supporting that educational benefits are being received, those indicia must arise from compliance and not deviation from the IEP.

In evaluating this evidence, we are guided by the requirement that HISD is to provide V.P. with a "basic floor of opportunity" that "consists of access to specialized instruction and related services" individually designed to provide V.P. with educational benefit. *Rowley*, 458 U.S. at 201. HISD did not need to provide V.P. with the best possible education or one that will maximize her potential; however, the education benefits it provides cannot be *de minimis*. *Michael F.*, 118 F.3d at 247 (citing *Rowley*, 458 U.S. at 188-89). This distinction may well be the key to the dispute before us. HISD clearly was taking steps to provide educational benefits to V.P. The question is not whether there was more that could be done, but only whether there was more that had to be done under the governing statute.

Passing grades and advancement from year to year are factors that indicate a child is receiving meaningful educational benefit. As a legal matter, we find that such evidence should be rejected when it is found to be the product of unapproved deviations from the IEP. V.P.'s classroom teacher, the stakeholder most familiar with V.P.'s performance, testified that although V.P. did not do well the first or second semester of her first-grade year, her grades improved near the end of the year *only because* the teacher started modifying more work product for her, including giving her fewer test items. Without these modifications, the teacher stated, V.P. could not have done work on the curriculum level with the non-disabled students in her class and could not have

made passing grades. The teacher explained that she made these modifications because the special education chair told her that they were part of V.P.'s IEP. However, V.P.'s IEP did not provide for modified curriculum or tests, and her teacher stated that she would have been concerned about making the modifications if she knew they were not in V.P.'s IEP. Finally, the teacher testified that despite V.P.'s passing grades, she did not believe V.P. mastered the curriculum necessary to move on to second grade.

Considering the testimony of V.P.'s teacher, the district court did not clearly err in concluding that the test scores were not reliable evidence of progress. The district court's factual determination that the child was not receiving educational benefits from her IEP was not clear error. As we said in *Bobby R.*, it is not necessary for the child "to improve in *every* area to obtain an educational benefit," 200 F.3d at 350, but there was no evidence here that had to be accepted that V.P. was improving in many areas at all.

The ultimate legal issue under this factor is whether V.P. was receiving a meaningful educational benefit from the services provided for her under her IEP. We find that she was not.

Therefore, we sustain the district court's finding that under the four factors, HISD was not providing a free appropriate public education. Consequently, V.P.'s move to the Parish School was justified.

B. *Reimbursement for Pendency Placement*

Our previous discussion leads to our affirming the award of $16,125.30 to reimburse V.P. for the payments to the Parish School for the 2004-2005 school year. Our last issue is whether HISD must make the same payment for the 2005-2006 school year.

In ruling on the cross motions for summary judgment on the 2005-2006 reimbursement issue, the district court again fully adopted the magistrate judge's findings. We will refer to the findings as those of the district court.

22

The components of this last issue are these: (1) what relevance to the second year's reimbursement is the Texas Education Agency's decision that the Parish School was the appropriate placement, (2) how was the issue of the second year's reimbursement raised, opposed, and resolved, and (3) was the issue properly resolved? We will discuss them in that order.

*1. Hearing officer's decision that Parish School was proper placement*

The IDEA provides that "during the pendency of any proceedings conducted pursuant to this section, unless the State or local educational agency and the parents otherwise agree, the child shall remain in the then-current educational placement of the child . . . ." 20 U.S.C. § 1415(j). The Supreme Court held that an administrative decision in favor of parents who had placed their child in a private school after they rejected a proposed IEP constitutes an agreement by the state to the change of the child's placement, making the new, private school placement the current educational placement of the child. *Burlington*, 471 U.S. at 371–72.

Accordingly, by force of Supreme Court opinion and federal regulation, the decision by the Texas Education Agency hearing officer on February 10, 2005, was an agreement between HISD and V.P.'s parents that the Parish School was the appropriate placement. The agreement lasts for the pendency of the review of the administrative decision. The regulation does not state that a parent needs to file for a court order declaring the alternative placement to be the correct one. Instead, unless the parents and school district agree otherwise, the Parish School by operation of law is the proper placement. *Id.*

Our case law is consistent with this interpretation. We have addressed related issues that arise when parents seek to have the public school district pay the costs of the private school pending the final review of the merits. *St. Tammany Parish Sch. Bd. v. Louisiana*, 142 F.3d 776, 785 (5th Cir. 1998). There, as here, the state administrative process resulted in an order that a

private placement was appropriate because the public school education was inadequate. *Id.* at 780. The administrative process ended in April of a school year, and the administrative ruling was that the entire school year should be paid for by the public school. *Id.* Also, as here, the school district filed an appeal in district court in April. Unlike here, in June, the *St. Tammany* parents counterclaimed for compensation for the next school year. *Id.* at 781. Such a counterclaim is what HISD argued and the district judge accepted had to be made here, but it never was. The *St. Tammany* parents sought an order declaring the private school placement to be the correct one, and requiring payments for the next school year to be made by the public school district. In August, as the new school year was beginning, the district court granted the parents their requested relief. *Id.*

The district court's ruling was immediately appealed. *Id.* We concluded that a stay-put order qualifies as a collateral order for purposes of interlocutory appeal because it conclusively determines a student's pendency placement and the tuition reimbursement rights associated with such placement. *Id.* at 781–82. In support of this holding, we cited a case from another circuit that found resolution of pendency-placement issues to be "completely separate from the merits issues which focus on adequacy of the proposed IEP; and the propriety of the pendent placement and the concomitant financial responsibility are not effectively reviewable on appeal of a decision on the merits." *Id.* at 782 (citing *Susquenita Sch. Dist. v. Raelee S.*, 96 F.3d 78, 81 n.4 (3d Cir. 1996)); *see also Mackey ex rel. Thomas M. v. Bd. of Educ. for the Arlington Cent. Sch. Dist.*, 386 F.3d 158, 160 (2d Cir. 2004) ("A claim for tuition reimbursement pursuant to the stay-put provision is evaluated independently from the evaluation of a claim for tuition reimbursement pursuant to the inadequacy of an IEP.").

In *St. Tammany*, the district court ordered payment for tuition and other costs for the school year that was about to begin. We affirmed. The Third

Circuit case on which we relied also reviewed such a district court order. *Susquenita Sch. Dist.*, 96 F.3d at 85. In that case, the school district appealed the administrative decision to the district court and filed for a stay of the requirement that it reimburse the parents for the private school placement. The district court denied the motion. On interlocutory appeal, the Third Circuit concluded that the school district was required to pay for the child's private school placement from the point of the administrative decision forward; it also held that the school district "may be required to pay for tuition and expenses associated with a pendent placement prior to the conclusion of the litigation." *Id.* at 84. The court explained that "[t]he purpose of the Act . . . is not advanced by requiring parents, who have succeeded in obtaining a ruling that a proposed IEP is inadequate, to front the funds for continued private education." *Id.* at 86–87.

What is of particular importance for our issue is that the court considered the right to continuing payments to be automatic from the district court's decision that the private school would be the "current educational placement." "This holding also effectively decided the reimbursement question in favor of Raelee's parents." *Id.* at 80. That sentence was followed by a footnote, which concluded that once reimbursement for the first year was found to be appropriate, payments for continuing the private school placement were proper while proceedings under the statute were pending:

> The order encompassed reimbursement for expenses incurred in the 1994-1995 academic year. By adopting the appeals panel holding that the private school was the appropriate placement pending a contrary judicial order, Order # 1 also effectively made Susquenita financially responsible for continuing the private school placement. Order # 1 thus decided both reimbursement for and prospective payment of private school tuition.

*Id.* at 81 n.3. As the Supreme Court held, public payment of expenses of the "current education placement" flows from "the child's right to a *free* appropriate public education" under the IDEA. *Burlington*, 471 U.S. at 370. Reimbursement forces a school district "to belatedly pay expenses that it should have paid all along and would have borne in the first instance had it developed a proper IEP." *Id.* at 370–71. *Burlington* did not involve paying for costs during the pendency of the litigation. Neither were we in *St. Tammany* faced with deciding the propriety of such payments because the state did not contest that legal issue. *St. Tammany*, 142 F.3d at 783. Our issue today is almost the opposite: do parents forfeit the right to receive reimbursements for the costs of the private placement, which by operation of law is the "current educational placement" during the pendency of the litigation, if they do not ask for funding at the beginning of a school year?

In answering that question, we examine the arguments as to why the right to reimbursement for the education that is supposed to be free has been forfeited here. The district court denied reimbursement for V.P.'s second school year almost exclusively because of the lack of notice to HISD that anyone was contemplating asking for payment. It is true that V.P. did not amend her pleadings specifically to request reimbursement. Soon after the second school year ended, she did seek to supplement the record with the new bills. Even without any filings by V.P., notice existed as a matter of law that the Parish School was the current educational placement until an agreement to the contrary or an end to the litigation was reached.

Relevant here is an issue still unresolved in this circuit, namely, if an order is entered that requires the public school district to pay for the private school during the pendency of the proceedings, will the parents have to refund the money if the private placement is later found to have been improper? *See id.* at 788 (stating, "we do not reach, nor do we express an opinion on, whether the

26

State defendants are entitled under IDEA to reimbursement" if the private placement is held to have been unnecessary). We still do not need to resolve that point, but the issue highlights a choice for a child's parents. They can request payment-as-they-go, but they *may* have to refund that money if they lose on the merits. Or, they can continue to pay for the private placement until such time as there is a final decision on the merits. Many parents will not have a choice, as the private school will be beyond their financial means. When there is a choice, the parents do not need to seek prospective relief, which under *St. Tammany* is an appealable order. They may instead ask for costs of the pendency placement to be made an award at the end of the litigation. That does not mean, though, that the parents can wait until the end of the litigation to make the request. We address that issue below.

HISD counters that had it known V.P. would seek reimbursement for the 2005-2006 school year, it could have proposed an alternative placement. For example, in an effort to avoid paying for a second year of V.P.'s Parish School costs, HISD could have attempted to develop a new IEP that corrected the deficiencies found by the due process hearing officer. Furthermore, HISD alleges it could have suggested an alternative placement at one of its schools, such as at the Sutton Elementary "oral deaf" program. HISD alleges V.P.'s delay kept it from appealing any intermediate order regarding the child's proper placement during the pendency of the district court proceedings.

HISD's position does not take into consideration that the Parish School was the proper placement for 2005-2006. We find useful guidance for HISD in *St. Tammany*. There*,* soon after the order was entered that the private school was the "current education placement," the school district moved to require a new IEP conference to determine how the public school could meet the child's needs. *Id.* The district court denied the motion. A similar motion by HISD is at least one way the issue of changing V.P.'s placement could have proceeded.

Perhaps HISD did not know until the 2005-2006 school year was over that V.P. would actually request reimbursement, but it constructively knew that by operation of law, the Parish School was the continuing proper placement for the child and that HISD might be requested to pay for it. The moving party for ending the "current educational placement" at the Parish School and the concomitant, but as yet unasserted, financial reimbursement potential needed to be HISD.

It is also important that after the date of *Burlington*, *St. Tammany*, and the Third Circuit *Susquenita* opinion, the U.S. Department of Education adopted the regulation that expresses the effect of the final order in the administrative proceedings that a private placement is proper. Effective on March 12, 1999, a slightly different phrasing of what is now 34 C.F.R. § 300.518(d) was promulgated. It stated that when the decision of "a State review official in an administrative appeal agrees with the child's parents that a change of placement is appropriate, that placement must be treated as an agreement between the State or local agency and the parents for purposes of paragraph (a) of this section." 34 C.F.R. § 300.514(c) (as adopted by 64 Fed. Reg. 12418 (Mar. 12, 1999)). The referenced "paragraph (a)" is similar to Section 300.518(a), the earlier version stating that the child "during the pendency of any administrative or judicial proceeding . . . must remain in his or her current education placement." *Id.* § 300.514(a).

It is true that in *St. Tammany*, the district court had ordered that the private school be considered the "current educational placement." 142 F.3d at 781. There was no holding in *St. Tammany* that such an order was needed. We conclude that Section 300.518 makes that kind of order superfluous.

A correlation between a private school's being the current educational placement and the public school's responsibility to fund it, is found in the IDEA:

(B) Children placed in, or referred to, private schools by public agencies

(i) In general. Children with disabilities in private schools and facilities are provided special education and related services, in accordance with an individualized education program, at no cost to their parents, if such children are placed in, or referred to, such schools or facilities by the State or appropriate local educational agency as the means of carrying out the requirements of this [subchapter]. . . .

. . .

(C) Payment for education of children enrolled in private schools without consent of or referral by the public agency

. . .

(ii) Reimbursement for private school placement. If the parents of a child with a disability, who previously received special education and related services under the authority of a public agency, enroll the child in a private elementary school or secondary school without the consent of or referral by the public agency, a court or a hearing officer may require the agency to reimburse the parents for the cost of that enrollment if the court or hearing officer finds that the agency had not made a free appropriate public education available to the child in a timely manner prior to that enrollment.

20 U.S.C. § 1412 (a)(10); *see also* 34 C.F.R. § 300.148(b).

These provisions allow a hearing officer to require reimbursement of private school costs when a free appropriate public education has not been made available. *Burlington* and Section 300.518 transform a hearing officer's order adopting a private placement into an agreement that the private school is necessary to carry out the requirements of the IDEA. That placement is at "no cost" to the parents of the child. 20 U.S.C. § 1412 (a)(10)(B)(i).

Pendency-placement issues are separate from the merits to the extent they can be decided prior to and without regard to the merits issues. We have noted that V.P.'s parents had a choice to request payments during the pendency of the litigation, or to forgo payment-as-they-go and await the conclusion of the merits case. Intentionally or otherwise, the request was not made until the end of the second school year. V.P. did not seek payments pending the litigation. Not

raising this separate issue at the earliest opportunity does not by itself prevent receiving reimbursement for relevant school years at the end of the litigation.

We have examined with some care the case law and regulations. Two events are crucial in our analysis. The first is the decision by a hearing officer for the Texas Education Agency that the Parish School was an appropriate placement for V.P. The second was the affirmance of that decision on appeal. Those two events having occurred, V.P.'s parents were entitled to have their costs at the Parish School reimbursed – absent any default in requesting them, an issue we discuss below. Valid costs for a private school placement may be reimbursed at the end of litigation in which the parents prevail without regard to whether an order for payment during the pendency of the proceedings is sought. The costs will be the relevant ones during the time period that begins with the school year for which the district is ultimately found not to have proposed a placement reasonably calculated to provide a free appropriate public education. The period ends with the conclusion of the litigation. A school district may be able to seek, as occurred in *St. Tammany*, to change the educational placement during the pendency of the litigation. Whatever steps that involves certainly need not be addressed now. Without such a change, the obligation for the proper public entities to pay for the private school exists.

Our holding does not resolve the issue of whether parents do not even need to ask for reimbursement. We now turn to just how the issue of reimbursement for a second year was injected in the appeal to the district court.

*2. Raising and disposing of the reimbursement issue in district court*

On February 10, 2005, the Texas Education Agency hearing officer declared the IEP to be inadequate. The Parish School was found to be an appropriate placement. V.P.'s parents were awarded payment for all of their daughter's 2004-2005 relevant expenses at the Parish School.

On May 10, 2005, HISD filed an appeal in district court.

On June 9, 2005, V.P. filed her answer and counterclaim, appealing the Hearing Officer's decisions on the issues for which she did not prevail at the due process hearing. This pleading did not include a claim for reimbursement for V.P.'s 2005-2006 placement at the Parish School.

During a September 8, 2005 Rule 16 scheduling hearing, V.P. first informed the court that she intended to introduce evidence in addition to the administrative record for the district court's consideration on appeal. V.P. did not explain what additional evidence she intended to introduce and did not explain that the additional evidence pertained to V.P.'s 2005-2006 Parish School placement. HISD stated that it opposed the entry of additional evidence and that the case should be decided solely on the administrative record.

On June 9, 2006, exactly a year after V.P. filed her answer, V.P. filed a motion to submit additional evidence in which she indicated that she intended to introduce reimbursement evidence regarding the costs of V.P.'s placement at the Parish School for the 2005-2006 school year. In a June 20, 2006 response, HISD objected to the motion, arguing that the only issue before the court was the correctness of the Hearing Officer's decision regarding the 2004-2005 school year, and the 2005-2006 private school bills were irrelevant to that issue.

The case was eventually reassigned to a new district judge who requested a status report from the parties. In that report, V.P. again indicated that she needed to submit additional evidence regarding reimbursement for the 2005-2006 school year. On July 6, 2006, V.P. filed a supplemental motion to submit additional evidence. In this motion, V.P. alleged that the Parish School was the proper placement for V.P. during the pendency of HISD's appeal, and accordingly, "V.P. [was] entitled to an automatic injunction providing her with reimbursement for the placement during the appeal, and until such time as HISD offers her an appropriate placement."

HISD responded that V.P. was belatedly attempting to "amend her complaint" to assert a new claim for relief under the guise of a request to introduce additional evidence and that pendency placement had not been made an issue in the case. In a reply brief, V.P. contended that the right to reimbursement for ongoing tuition at the Parish School is automatic and is merely a continuation of the issues decided by the administrative hearing officer. V.P. further stated that "reimbursement of the pendency placement is actually a cost which [she] is entitled to if she prevails in this matter" and that HISD has not demonstrated that it was surprised or prejudiced by the pendency reimbursement claim.

On August 9, 2006, the magistrate judge conducted a hearing regarding, among other things, V.P.'s motion to submit additional evidence. There were two items of evidence. One was a new affidavit from an expert, and the other were bills for the second school year. At the hearing, V.P. argued that the 2005-2006 Parish School bills were just an extension of the hearing officer's order and should be considered as a "cost issue" if the court decides to uphold that decision. The magistrate judge initially indicated she would deny V.P.'s request to submit the bills. Later in the hearing, in response to argument, the magistrate judge delayed decision until a future date, saying "yes, if this goes your way, yeah, we'll consider that, but right now to keep amending to put the school bills in, you know, you haven't won yet. And we'll cross that bridge when it comes to it." The magistrate judge and counsel for HISD then engaged in the following exchange:

> THE COURT: I mean it seems to me that if you lose and the hearing officer's decision is implemented, HISD is going to have to pay those bills, right? And we will have to know what they are.
>
> HISD COUNSEL: Well, irrespective – I don't necessarily agree to that, but irrespective of that, in terms of the [c]ourt's time– . . . it makes more sense for you to rule on the motion for summary judgment because if you rule for me, those issues will be moot . . .

and we won't have to touch on them. If you rule on all that stuff now, you may be making rulings that you won't have to make.

THE COURT: Right.

On March 2, 2007, the magistrate judge recommended granting in part and denying in part HISD's motion for summary judgment. With respect to the 2005-2006 Parish School costs, the memorandum explained that "[a]lthough [V.P.] requests reimbursement for the costs of the Parish School during the pendency of this review, she did not move for summary judgment on that issue. The court refrains from addressing that matter at this time." On March 22, 2007, the district judge entered an order adopting the recommendation.

The magistrate judge then ordered HISD and V.P. to file cross motions for summary judgment on the 2005-2006 reimbursement issue. On September 11, 2007, the magistrate judge recommended the denial of reimbursement for the 2005-2006 Parish School placement. The judge concluded that V.P.'s "late mention of additional and ongoing education costs at the Parish School does not properly meet the requisite timing and form necessary to put [HISD] on notice of the 2005-2006 reimbursement claim." The judge also held that the failure to add this claim to the pleadings meant it could not be awarded as "appropriate" relief under the IDEA without ignoring the Federal Rules of Civil Procedure. Finally, the magistrate judge concluded that reimbursement for the 2005-2006 school year under the IDEA's "stay put" provision would be collateral to the court's review of the hearing officer's decision on the merits.[5] The district judge adopted the magistrate judge's memorandum and recommendation on October 4, 2007, over V.P.'s objections.

3. *Resolution of the issue*

---

[5] We note an inconsistency in the conclusion that the claim was not properly in the case, but also that summary judgment should be granted to HISD on the claim.

This review of the procedural history reveals that V.P. raised the issue of reimbursement for the second school year by a motion to introduce additional evidence. The motion was filed one year after her answer and counterclaim, a month or so after the second school year ended, and one year before final judgment. She never moved to amend the answer and counterclaim.

Despite the intricacies of the federal statutes we are applying, the usual pleading rules remain relevant. The appeal by HISD to the district court started a lawsuit. An answer and counterclaim were filed, seeking certain relief. The request for prospective payments for the second school year could easily have been made in the initial pleadings by V.P. in district court. Or, a motion for leave to amend could later have been made when the school year was over, seeking reimbursement. Amendments to pleadings are to be allowed when "justice so requires . . . ." Fed. R. Civ. P. 15(a)(2). Because no amendment was ever requested, the justice of such a motion is not before us.

V.P. maintains that her request in her counterclaim that the district court uphold the hearing officer's decision was sufficient to raise her right to reimbursement for the 2005-2006 Parish School placement. Under the stay-put or pendency-placement provision of the IDEA, V.P. argues that she became eligible for reimbursement for the 2005-2006 Parish School tuition once the placement for 2004-2005 was upheld. Under her theory, she did not need to file a specific pleading or bring a separate action asserting a claim for pendency-placement reimbursement to obtain such relief.

HISD argues that it would be prejudicial to require pendency-placement reimbursement without a timely and explicit claim for such relief. If V.P. had sought an order from the hearing officer or the district court regarding the 2005-2006 pendency placement, HISD alleges it would have had an opportunity to propose an alternative placement or appeal the pendency-placement order. We have already addressed the latter points, and have found no merit to them.

As to what was required in V.P.'s pleading, we note that "the remedies a federal court may bring to bear are not constrained by a litigant's prayer for relief; rather, the Federal Rules of Civil Procedure command the federal courts to grant relief that complainants do not demand when such relief is appropriate." *Bauhaus USA, Inc. v. Copeland*, 292 F.3d 439, 448 (5th Cir. 2002); *see also Kirchberg v. Feenstra*, 708 F.2d 991, 1000 (5th Cir. 1983) ("Rule 54(c) of the Federal Rules of Civil Procedure provides that a judgement shall grant the relief to which a party in whose favor it is rendered is entitled, even *if the party has not demanded this relief in his pleadings*." (emphasis in original)). The district court apparently determined that a request for a second year's reimbursement did not concern the nature of relief, but was a claim of a separate injury. Some decisions under the IDEA have held that general prayers for relief are insufficient to raise claims for reimbursement of school expenses that were not explicitly made. The magistrate judge cited some of these decisions in denying recovery of the second school year's expenses. *E.g., Lillbask v. Conn. Dep't of Educ.*, 397 F.3d 77, 90 (2d Cir. 2005).

We do not decide whether reimbursement for a second year is a new claim or whether it is additional relief on the existing claim. We turn instead to the effect of the magistrate judge's statements at one hearing, and HISD's responses.

Regardless of whether a claim for a second year should have been the subject of amended pleadings, V.P. argues that the magistrate judge's ruling on the motion to supplement the record indicated the question of reimbursement for a second year was tied to the not-yet-made decision on whether to affirm the Texas Education Agency's decision that the Parish School was the proper placement. As we have discussed, the magistrate judge on August 9, 2006, stated that if the decision as to the Parish School placement "goes your way, . . . we'll consider" the bills for the second year. The judge did not see a reason for

the parents to "keep amending to put the school bills" into the record as they were received. Instead, "we'll cross that bridge when it comes to it."

Even more pointedly, the judge then stated that if the hearing officer's decision "is implemented, HISD is going to have to pay those bills, right?" HISD's attorney immediately indicated that he did not "necessarily agree to that," but that in terms of the court's time, "it makes more sense for you to rule on the motion for summary judgment [and hold that HISD provided an appropriate education,] because if you rule for me, those issues will be moot." The magistrate judge agreed.

At that point, the magistrate judge was finding that the only predicate for reimbursement of appropriate expenses from the second year was that the administrative decision be affirmed. This ruling in no manner suggested that another predicate was an amendment to the answer and counterclaim.

An order was entered on August 9, 2006, reflecting the rulings made at the hearing. It stated only this:

> Arguments heard on the record. Docket Entries Nos. 16, 21, and 28 are granted. Docket Entry No. 20, 26, and 34 are granted in part and denied in part as stated on the record.

Docket Entry 20 was V.P.'s request to submit an affidavit from a new expert and cost bills for attending the Parish School during the pendency of the appeal. To grant and deny that motion "as stated on the record," was a decision that the expert's affidavit would be admitted, and that the bills for the second year would not be at that time. We also interpret the order, though, to mean that the bills would likely be admissible if the hearing officer's decision was upheld.

So as of August 9, 2006, V.P. had reason to proceed on the basis that appropriate expenses for the 2005-2006 school year would be reimbursed if the hearing officer's decision was affirmed. There was no suggestion from the magistrate judge that any amendment to the pleadings was needed.

Subsequent steps were taken that were consistent with this understanding. On March 22, 2007, the district court approved the magistrate judge's recommendation that the Parish School was the appropriate placement. In the same set of findings, the magistrate judge decided that there was not enough evidence in the record to determine whether all of the submitted costs for the private school should be reimbursed. Because V.P. had not moved for summary judgment on reimbursement during the pendency of the review, the issue was explicitly left for another time.

On the same date that the district court sustained the earlier magistrate judge's recommendation, the magistrate judge entered a new order as to reimbursement. The fact that V.P. had requested additional compensation for the continued placement during the appeal was noted. No suggestion of any pleading defect was indicated, and instead this was stated:

> In order for the court to determine the proper amount of relief, the court must determine whether other, more suitable substitute placements existed, whether the parents expended sufficient effort in securing an alternative placement, whether the school district cooperated with the parents on the child's placement, and whether the parents are entitled to reimbursement for the period of appeal. *Cf. Alamo Heights Indep. Sch. Dist. v. State Bd. of Educ.*, 790 F.2d 1153, 1161 (5th Cir. 1986) (listing factors to consider in determining whether parents are entitled to full reimbursement for the cost of private school enrollment). The court has determined that the record must be developed further, as to both facts and law, before the court can exercise its discretion in determining the amount to be awarded.

The *Alamo Heights* precedent concerned whether the costs of a program should be reimbursed, even if the program was not *necessitated* by the IDEA:

> Factors that the court may consider in determining whether full or partial reimbursement is in order would include the existence of other, perhaps more suitable, substitute placements, the effort expended by Mrs. G. in securing alternative placements, and the

general cooperative or uncooperative position of the School District itself.

*Alamo Heights*, 790 F.2d at 1161. Here, the appropriateness of the Parish School placement had been resolved, but specific items of costs could have been subject to disagreement. The parties were ordered to attempt reaching an agreement on the reimbursement amount. Absent agreement, an evidentiary hearing would be held.

By July 20, 2007, the parties had agreed that $16,125.30 was the appropriate amount of reimbursement for 2004-2005, and if reimbursement were found appropriate, also for 2005-2006. HISD, in a motion filed on that date, argued that V.P.'s failure ever to amend her pleadings to request reimbursement for a second year barred its consideration. In a response, V.P. argued that HISD's position was inconsistent with what had been known at least since the June 20, 2006 motion to supplement the record, namely, that reimbursement for the second year was being sought. V.P. argued that HISD had introduced a new objection by alleging an absence of pleadings. The original objection to the motion to supplement back on June 20, 2006, was that V.P. needed to go through the administrative process again for the second year, and that the appeal of the validity of the hearing officer's decision in no way affected the payment of costs for another year. As we have discussed above, neither of those defenses was valid. Because of *Burlington* and the federal regulations, the hearing officer's decision made the Parish School the agreed proper placement during the pendency of the appeal. The appeal was very much the place in which these issues could be resolved, not a second administrative proceeding.

The district court found that payment for the 2005-2006 Parish School costs could be awarded under authority to "grant such relief as the court determines is appropriate. . . ." 20 U.S.C. § 1415(i)(2)(C)(iii). The court declined to do so, even saying that it could not do so, because of V.P.'s failure adequately

and timely to raise the pendency placement issue. We disagree with that ruling. Because HISD was on notice no later than the August 9, 2006 hearing that V.P.'s request for reimbursement of the second year might well rise or fall on whether the hearing officer's decision was upheld, a linkage made by the magistrate judge in the oral ruling, there was no fatal flaw in the pleadings. In effect, there was a ruling as of August 2006 that ignored any issue of pleadings and made the subsequent viability of the claim dependent on other factors.

We do not overlook that more clarity could have been given to this point by both the magistrate judge and by V.P.'s attorney. We have had to piece together statements from the hearing and in the brief written order. Yet those shortcomings are far less significant than the denial of the claim in the face of these facts: (1) clear indications by the magistrate judge in August 2006 when the issue was first addressed that the only question was whether the administrative decision was ultimately affirmed, (2) HISD's knowledge at least since August 2006 that reimbursement for a second year was being sought, and (3) under the regulations and *Burlington*, HISD could not avoid responsibility for the pendency placement if the hearing officer's decision was affirmed.

By the time of the magistrate judge's decision on September 11, 2007, that same judge no longer saw the issue as she had thirteen months earlier. Certainly, any interim order may be altered at any time before final judgment. Fed. R. Civ. P. 54(b). We find it to have been an abuse of discretion, though, to reverse the earlier course on the issue of pleadings. HISD had for that entire time been fully aware of V.P.'s pursuit of the second year's reimbursement, even if it would not relinquish its disagreement with the magistrate judge's earlier indications that costs of a second year depended strictly on affirming the propriety of the first year.

There was no lack of notice to HISD. By operation of the precedents and federal regulations, HISD had notice of a legal obligation. By operation of the

39

understandings arising from the August 9, 2006 hearing, there was notice that V.P. was seeking reimbursement for a second year and payment was dependent on the Texas Education Agency hearing officer's decision being affirmed.

The parties stipulated that if reimbursement for a second year became due, the proper amount would be $16,125.30. We reverse the refusal to award reimbursement for the second year at the Parish School and render judgment for the amount agreed to by the parties.

C.    *Interests, Attorney's Fees, and Costs*

In the conclusion of her briefs on appeal, V.P. summarily asserts that the district court improperly denied an award of attorney's fees and related costs for her attorney's work on the pendency reimbursement issue. V.P. further requests that the court award interest on the reimbursement for the 2004-2005 and 2005-2006 Parish School costs from the date of the first payment made by V.P.'s parents and award "all attorney's fees and related costs without reduction for all work done in this matter including this appeal."  Finally, V.P. asks for "the application of a multiplier of three times the amount due on the reimbursement and the attorneys fees and related costs, due to the extended time caused by the vexatious appeals of HISD, and the . . . impact that this extended litigation has had on the family and V.P."  HISD provides little response to V.P.'s requests, simply stating that the court should reverse the award of attorney's fees with respect to the 2004-2005 school year because it provided V.P. with a free appropriate public education and should deny V.P. attorney's fees and related costs for the 2005-2006 school year.

In its final judgment in this case, the district court awarded V.P. her costs. Additionally, the magistrate judge granted in part V.P.'s post-judgment supplemental bill of costs and application for attorney's fees.  Denied were fees for the portion of her  attorney's time spent working on the 2005-2006 pendency

40

reimbursement issue. The denial was based on the conclusion that V.P. was not a prevailing party with respect to that claim.

The parties only briefly reference the attorney's fees awarded to V.P. for work on the 2004-2005 school year issues. The magistrate judge awarded such fees after both the final judgment and the notices of appeal were entered in this case. We find that this award is not presently before the court

With respect to costs and attorney's fees for work associated with the 2005-2006 school year, the magistrate judge did not award V.P. any attorney's fees due to its conclusion that she was not a prevailing party on this claim. Because we reverse and render the district court's judgment regarding reimbursement for the 2005-2006 placement, we remand to the district court V.P.'s request for attorney's fees and costs regarding this issue.

## III. CONCLUSION

The judgment of the district court is AFFIRMED as to the 2004-2005 school year, but REVERSED and RENDERED as to a payment of $16,125.30 for the 2005-2006 school year. V.P.'s request for attorney's fees and costs associated with the 2005-2006 reimbursement claim is REMANDED to the district court. We express no opinion about the attorney's fees that were awarded below, as issues regarding them have not been properly presented in this appeal.