# IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

United States Court of Appeals
Fifth Circuit

**F I L E D**

May 27, 2010

No. 09-40369

Lyle W. Cayce
Clerk

R.H., Unidentified Party, by His Parents and Next Friends;
EMILY H., Unidentified Party; and MATTHEW H., Unidentified Party,

Plaintiffs-Appellants,

versus

PLANO INDEPENDENT SCHOOL DISTRICT,

Defendant-Appellee.

Appeal from the United States District Court
for the Eastern District of Texas

Before JONES, Chief Judge, SMITH and ELROD, Circuit Judges.
JERRY E. SMITH, Circuit Judge:

R.H., a minor, appeals the denial of tuition reimbursement for private pre-schooling under the Individuals with Disabilities Education Act ("IDEA"). We affirm.

No. 09-40369

## I. The IDEA.

Congress enacted the IDEA to ensure that children with disabilities will have access to public education, including special education and related services. *See* 20 U.S.C. § 1400(d)(1)(A); *Daniel R.R. v. State Bd. of Educ.*, 874 F.2d 1036, 1044 (5th Cir. 1989). The IDEA requires school districts in states receiving designated federal funds to implement procedures and policies that assure that each disabled student receives a "free appropriate public education," or "FAPE." 20 U.S.C. §§ 1412(a)(1), 1415(a). To ensure that a child receives a FAPE, parents and school districts collaborate to develop an Individualized Education Plan ("IEP") that is "reasonably calculated to enable the child to receive educational benefits."[1]

In Texas, a committee that develops an IEP is known as an Admissions, Review, and Dismissal ("ARD") Committee. *Cypress-Fairbanks Indep. Sch. Dist. v. Michael F.*, 118 F.3d 245, 247 (5th Cir. 1997). The ARD Committee consists of the parents of the child; at least one of his regular education teachers; at least one special-education teacher; a qualified representative of the school district; an individual who can interpret "the instructional implications of evaluation results;" other individuals who have knowledge or special expertise regarding the child (included at the discretion of the parent or agency); and, where appropriate, the child. *V.P.*, 582 F.3d at 580 n.1 (citations omitted).

The IDEA does not entitle a disabled child to an IEP that maximizes his potential, but instead only guarantees a "basic floor" of opportunity "specifically designed to meet the child's unique needs, supported by services that will permit him to benefit from the instruction." *Richardson Indep. Sch. Dist. v. Michael Z.*, 580 F.3d 286, 292 (5th Cir. 2009) (citations omitted). The educational benefit,

---

[1] *Houston Indep. Sch. Dist. v. V.P. ex rel. Juan P.*, 582 F.3d 576, 583-84 (5th Cir. 2009) (citation omitted), *cert. denied*, 78 U.S.L.W. 3546 (U.S. Mar. 22, 2010); *see also* 20 U.S.C. § 1415(b)(1).

No. 09-40369

however, "cannot be a mere modicum or *de minimis*; rather, an IEP must be likely to produce progress, not regression or trivial educational advancement." *Id.* (citation omitted).

One of the primary mandates of the IDEA, and the central focus in this case, is "mainstreaming," which is the requirement that an IEP place a disabled child in the least restrictive environment ("LRE") for his education:

> In general[, t]o the maximum extent appropriate, children with disabilities, including children in public or private institutions or other care facilities, are educated with children who are not disabled, and special classes, separate schooling, or other removal of children with disabilities from the regular educational environment occurs only when the nature or severity of the disability of a child is such that education in regular classes with the use of supplementary aids and services cannot be achieved satisfactorily.

20 U.S.C. § 1412(a)(5)(A). *See Daniel R.R.*, 874 F.2d at 1039.

"By creating a statutory preference for mainstreaming, Congress also created a tension between two provisions of the [IDEA]," the requirement that a school district provide a FAPE on the one hand, and the requirement that, on the other hand, it does so within the least restrictive environment. *Id.* at 1044. "Even when school officials can mainstream [a] child," however, "they need not provide for an exclusively mainstreamed environment." *Id.* at 1045. Rather, "the [IDEA] requires school officials to mainstream each child only to the maximum extent appropriate. In short, the [IDEA]'s mandate for [FAPE] qualifies and limits its mandate for education in the regular classroom." *Id.* (citation omitted).

## II.  Factual Background.

R.H. was born in December 2001. At age two, he received an evaluation through Texas's Early Childhood Intervention ("ECI") program and was deemed eligible for ECI services, namely, speech and occupational therapy.

3

In June 2004, R.H. began attending TLC, a private preschool, and continued there until December of that year, when his parents convened with officials from Plano Independent School District ("PISD" or "the district") for an ARD committee meeting. At the meeting, R.H. was determined to qualify for IDEA services because of suspected autism and speech impairment. The ARD committee also developed R.H.'s IEP, which proposed placing him part-time in a class at Beaty Early Childhood School ("Beaty") that included both special education and typically developing students. R.H. would also receive supplemental services, including weekly speech therapy sessions. His parents agreed to the IEP.

R.H. enrolled at Beaty in January 2005 and spent most of the spring semester there. The record reflects that, while at Beaty, he made some progress toward the goals listed in his IEP. Nevertheless, his parents became concerned that he was showing behavioral regression. During a parent-teacher conference in March 2005, they expressed concern about the perceived regression and stated their belief that R.H. needed summer school.

In May 2005, after receiving no response from PISD about their concerns, R.H.'s parents removed him from Beaty and re-enrolled him at TLC. By that time, the spring curriculum had ended at TLC, and R.H. participated in a less structured summer program, which a TLC employee referred to as "play time." R.H.'s teacher at TLC was not certified to teach in Texas public schools, was not certified in special education, and did not have a college degree. TLC did not have a speech or occupational therapist on staff. R.H.'s parents believed, however, that R.H. was better suited to be at TLC, in large part because the ratio of typically developing students to special education students was higher than at Beaty. During the summer, R.H.'s parents obtained private speech and occupational therapy for him.

At the end of the summer, PISD and R.H.'s parents held another ARD

4

meeting to discuss modifications to the IEP.  More ARD meetings followed throughout the fall, until January 2006.  R.H.'s parents wanted PISD to provide R.H. with a full day's schedule and 90 minutes of individual speech therapy and 30 minutes of group speech therapy each week.  The district instead offered to lengthen R.H.'s school day from 2 hours, 45 minutes to 3 hours, 45 minutes, including supervised lunch time with other students to address some of R.H.'s difficulties with eating.  The district also offered 15 minutes of individual speech therapy and 75 minutes of group therapy each week.  As an alternative, the district offered a "dual enrollment" option, whereby R.H.'s parents could enroll him at TLC at their own expense but receive supplemental services at Beaty at no cost.

The parties could not reach an agreement.  R.H.'s parents requested a due process hearing pursuant to the IDEA, which was held before a special hearing officer in April 2006.  At the hearing, R.H. alleged that PISD had denied him a FAPE.  Specifically, he alleged that, in developing his IEP, the district had failed to (1) consider the full continuum of placement options, including non-special education environments; (2) offer an appropriate educational program at Beaty during the spring of 2005; (3) place him in the LRE available for his education; and (4) provide him with extended-school-year education for the summer of 2005.  R.H. requested reimbursement for his tuition at TLC and privately obtained speech, occupational, and physical therapy from May 2005 onward, as well as an order that PISD continue to pay for tuition and therapy until he began kindergarten in the fall of 2008.

The hearing officer found in favor of PISD on all but the extended-school-year claim.  Although the hearing officer found that the district had improperly denied R.H. services for the summer of 2005, she did not award reimbursement, because R.H. had failed to notify PISD of his intent to enroll at TLC during that period as required by 20 U.S.C. § 1412(a)(10)(C)(iii).

No. 09-40369

R.H. sued. Both parties moved for summary judgment after agreeing that the evidence in the administrative record was sufficient. The magistrate judge issued a report and recommendation in favor of affirming the ruling of the hearing officer. The magistrate judge found that R.H.'s IEP provided him with a FAPE, including an education in the LRE, and that R.H.'s failure to give notice under § 1412(a)(10)(C)(iii) barred reimbursement for tuition at TLC during the summer of 2005. Over R.H.'s objections, the district court adopted the report and recommendation.

On appeal, R.H. argues that his placement at Beaty violated the IDEA because it was not the LRE for his education and because PISD failed to follow certain procedural requirements of the IDEA. R.H. also contends that the notice requirement, which the district court held barred recovery for summer 2005 tuition, does not apply.

### III. Standard of Review.

The district court, reviewing the decision of a hearing officer under the IDEA, accords "due weight" to the hearing officer's findings but ultimately reaches "an independent decision based upon the preponderance of the evidence" that is "virtually de novo." *Michael F.*, 118 F.3d at 252. We review the district court's decision that the IEP's placement of R.H. at Beaty was appropriate under the IDEA *de novo* as a mixed question of law and fact.[2] The findings of underlying facts, "such as findings that a disabled student obtained educational benefits under an IEP," are subject to clear error review. *Id.* (citations omitted).

---

[2] *Houston Indep. Sch. Dist. v. Bobby R.*, 200 F.3d 341, 347 (5th Cir. 2000) (citation omitted); *see also Brillion v. Klein Indep. Sch. Dist.*, 100 F. App'x 309, 312 (5th Cir. 2004) ("In our view, compliance with the mainstreaming requirement presents a mixed question of law and fact, review is de novo . . . .").

The role of the judiciary is not to second-guess the decisions of school officials or to substitute their plans for the education of disabled students with the court's. *Flour Bluff Indep. Sch. Dist. v. Katherine M.*, 91 F.3d 689, 693 (5th Cir. 1996) (citation omitted). Instead, the court's role is limited to determining whether those officials have complied with the IDEA. *Id.* (citation omitted). The IDEA creates a presumption in favor of a school district's educational plan, placing the burden of proof, by preponderance of the evidence, on the party challenging it. *Salley v. St. Tammany Parish Sch. Bd.*, 57 F.3d 458, 467 (5th Cir. 1995) (citation omitted).

If there is a violation of the IDEA, we review the district court's decision not to grant tuition reimbursement for abuse of discretion. *St. Tammany Parish Sch. Bd. v. Louisiana*, 142 F.3d 776, 782-83 (5th Cir. 1998). Because we affirm the finding that PISD did provide R.H. with a FAPE, however, we need not review the denial of reimbursement.

## IV. Tuition Reimbursement for the Regular School Year.

Tuition reimbursement for private education is a remedy available to courts and hearing officers where a school district fails to provide a child with a FAPE.[3] To receive reimbursement, R.H. must show that (1) his IEP's public placement at Beaty was inappropriate under the IDEA and (2) his private school placement––in this case, at TLC––was proper under the IDEA.[4]

---

[3] "If the parents of a child with a disability, who previously received special education and related services under the authority of a public agency, enroll the child in a private elementary school or secondary school without the consent of or referral by the public agency, a court or a hearing officer may require the agency to reimburse the parents for the cost of that enrollment if the court or hearing officer finds that the agency had not made a free appropriate public education available to the child in a timely manner prior to that enrollment." 20 U.S.C. § 1412(a)(10)(C)(ii).

[4] *Michael Z.*, 580 F.3d at 293; *see also Florence County Sch. Dist. Four v. Carter ex rel.*
(continued...)

No. 09-40369

We determine whether R.H.'s IEP appropriately placed him at Beaty by considering two additional questions. First, did PISD comply with the procedural requirements of the IDEA? And second, was the IEP "reasonably calculated to enable [R.H.] to receive educational benefits?" *Michael Z.*, 580 F.3d at 293 (citing *Bd. of Educ. v. Rowley*, 458 U.S. 176, 206-07 (1982)).

A. Did PISD Comply with IDEA's Procedural Requirements?

R.H. alleges three violations of the IDEA that could be construed as "procedural." He does not explicitly identify them as procedural, perhaps because the district court held that he had not alleged procedural violations in his complaint and had thus waived his right to pursue such claims. Though we are inclined to agree, we review R.H.'s procedural claims, assuming *arguendo* that they were properly raised.

The first such claim is that PISD failed to consider the harmful effects of placing R.H. at Beaty when developing his IEP, as required by "34 C.F.R. § 300.552(d)." That regulation no longer exists. R.H. gives us no information about whether it was effective at relevant times in the past. Because the claim is inadequately briefed, it is waived. *United States v. Martinez*, 263 F.3d 436, 438 (5th Cir. 2001).

Even if we were to consider the argument, it is directly controverted by the record. R.H.'s IEP from December 2004 contains a standard subsection entitled, "Consideration of Potential Harmful Effects," which indicates that the ARD committee members––including R.H.'s parent––discussed the potential harmful effects of R.H.'s placement at Beaty.[5]

---

[4] (...continued)
*Carter*, 510 U.S. 7, 12-13 (1993).

[5] The potential harmful effects considered included lack of opportunity for appropriate
(continued...)

No. 09-40369

R.H. also alleges that his IEP offered no "explanation of the extent, if any, to which [R.H.] w[ould] not participate with nondisabled children in the regular class," in violation of 20 U.S.C. § 1414(d)(1)(A)(i)(V). Again, the IEP controverts R.H.'s claim. It contains a standard section entitled "Committee Justification for Removal from the General Education," which explains that R.H.'s "needs/behaviors are such that he requires a full-time special education setting" but that he would still be part of a "General Education Campus" with "opportunity to participate with students without disabilities in all nonacademic and extracurricular activities to the maximum extent appropriate." Therefore, R.H. has not met his burden of proving a procedural violation in that respect.

Finally, R.H. claims his ARD committee violated the IDEA's procedural requirements because it did not consider placing him in a "regular," as opposed to special, educational setting with supplementary aids as needed. That argument dovetails with R.H.'s principal substantive claim, that his IEP was not reasonably calculated to deliver educational benefits, because it violated the LRE requirement of the IDEA. Because of that overlap, and because R.H. has not explicitly identified a distinct procedural claim in his briefing, we will consider this claim as part of his allegation that PISD violated the substantive LRE requirement of the IDEA.[6]

---

[5] (...continued)
role models, stigmatization, isolation from peers, diminished access to full range of curriculum, decreased student self-esteem, and decreased access to the instructional opportunities available in integrated settings.

[6] Citing *Daniel R.R.*, 874 F.2d at 1043, the district court noted that this circuit "has treated the failure to provide a continuum of educational services as a procedural, rather than substantive, violation of IDEA." *Daniel R.R.* is admittedly confusing on the procedural-versus-substantive nature of the LRE requirement. One part of that opinion treats a school district's failure to provide a "continuum" of "alternative placements and supplementary services in conjunction with regular class placement" as a procedural violation. *Id.* (citation omitted). Another part, however, considers the question "whether the state has taken steps to accommodate the handicapped child in regular education . . . [using] supplementary aids and services" (continued...)

No. 09-40369

B.  Was the Substance of the IEP Reasonably Calculated?

We move from procedure to substance.  The second question we address, in reviewing the appropriateness of R.H.'s placement at Beaty, is whether the substance of his IEP was "reasonably calculated to enable [him] to receive educational benefits."  *Michael Z.*, 580 F.3d at 293.

1.  The LRE Requirement in *Michael F.* and *Daniel R.R.*

At the outset, we must reconcile some of our precedent.  We determine whether an IEP was reasonably calculated using the four factors identified in *Michael F.*, 118 F.3d at 253:  (1) Is the program individualized on the basis of the student's assessment and performance; (2) is the program administered in the least restrictive environment; (3) are the services provided in a coordinated and collaborative manner by the key "stakeholders"; and (4) are positive academic and non-academic benefits demonstrated?

R.H. argues, however, that analysis under *Michael F.* is premature until we examine whether his IEP satisfies the statute's LRE requirement.  He points to *Daniel R.R.*, 874 F.2d at 1045, in which we said the "two part inquiry"––looking first to procedural violations and second to whether an IEP was reasonably calculated––is "not the appropriate tool for determining whether a school district has met its mainstreaming [i.e., LRE] obligations."  We then developed an independent test for satisfying the LRE requirement.

*Michael F.* and *Daniel R.R.* are not in conflict.  *Michael F.* interpreted the LRE requirement as part of the FAPE requirement but did not alter *Daniel R.R.*'s framework for determining whether a school district satisfies the LRE requirement.  Our analysis of the second *Michael F.* factor, then, is guided by *Dan-*

---

[6] (...continued)

as a substantive matter.  *Id.* at 1048.  For purposes of this case, however, we need not digress into the subtle distinctions between procedural and substantive LRE claims.

10

*iel R.R.*

R.H. did not address the *Michael F.* factors in his briefing, insisting that only *Daniel R.R.* is relevant. As we have just explained, we consider his arguments as relating to the second *Michael F.* factor, whether the IEP satisfied the statute's LRE provision. As for the other *Michael F.* factors, nothing in R.H.'s briefing could be construed as challenging the district court's finding that PISD satisfied the first (individualized program) and third (stakeholder involvement) factors. R.H. does argue that he regressed during his time at Beaty, and this could be construed as a challenge to the district court's finding, under the fourth factor, that R.H. demonstrated positive academic and nonacademic benefits under his IEP. We therefore review the district court's findings under the second and fourth *Michael F.* factors.

### 2. Standard of Review Under *Michael F.*

We review the district court's underlying factual findings under each of the four *Michael F.* factors for clear error.[7] We consider *de novo* any legal issues that arise under the four factors. *V.P.*, 582 F.3d at 584.

### 3. *Michael F.* Factor Two: the LRE Requirement.

In *Daniel R.R.*, 874 F.2d at 1048, we stated a flexible, two-part test for determining whether an IEP's placement was in the LRE. "First, we ask whether education in the regular classroom, with the use of supplemental aids and services can be achieved satisfactorily for a given child." *Daniel R.R.*, 874 F.2d at 1048. "If it cannot and the school intends to provide special education or to re-

---

[7] *V.P.*, 582 F.3d at 583 (reviewing the district court's findings under each *Michael F.* factor, including the LRE requirement, for clear error); *but see Brillion v. Klein Indep. Sch. Dist.*, 100 F. App'x 309, 312 (5th Cir. 2004) ("In our view, compliance with the mainstreaming requirement presents a mixed question of law and fact, [and] review is de novo.").

move the child from regular education, we ask, second, whether the school has mainstreamed the child to the maximum extent appropriate." *Id.* At the outset of step one, "we must examine whether the state has taken steps to accommodate the handicapped child in regular education . . . . If the state has made no effort to take such accommodating steps, our inquiry ends, for the state is in violation of the Act's express mandate to supplement and modify regular education." *Id.*

R.H.'s central argument is that PISD fails *Daniel R.R.* step one (and thus, *Michael F.* factor two), because the district did not consider placing him anywhere except at Beaty. His class at Beaty, R.H. argues, is a "special education" setting, not a "regular" setting. It follows that PISD took no "steps to accommodate [him] in regular education," as required by the IDEA.

We disagree. The hearing officer found that PISD had considered placing R.H. in a fully mainstreamed environment but rejected that option. That finding was amply supported by evidence offered at the due-process hearing. Susie Vaughn, the principal at Beaty and a member of R.H.'s ARD committee, testified that the committee was aware of R.H.'s previous enrollment at TLC, but because of the needs identified in R.H.'s IEP––a low staff-to-student ratio, a special education teacher with knowledge of autism, regular collaboration with a speech pathologist––the committee could not be confident that the IEP could be implemented in a private school setting, without PISD's direct supervision.

At one point, Vaughn admitted that she personally "did not consider" whether R.H.'s IEP "could be implemented in a typical pre-school setting." But she later clarified, "I wouldn't say that it wasn't that we couldn't consider [implementing the IEP at a private preschool], because we obviously did consider it. It's that we didn't recommend it. We didn't advise that because we couldn't

assure that we could implement that IEP as written in that preschool setting."[8]

The picture that emerges from the due-process hearing transcript is of an ARD committee marshaling a range of resources and services to ensure R.H. a free appropriate public education. As the IEP developed, it seemed apparent to the committee members––including R.H.'s mother––that the best place to implement the plan was at Beaty. The ARD committee was well aware of R.H.'s previous experience in private preschool, but considering all his newly identified needs and newly offered resources, the committee did not recommend that he continue at TLC. The hearing officer thus concluded that R.H. had not met his burden to prove PISD failed to consider a full continuum of placement options.

The district court, giving due weight to the hearing officer's factual findings but still conducting an independent review, left that finding in place and found no violation of either the procedural or substantive requirements of the IDEA. *Michael F.*, 118 F.3d at 252. We review that underlying factual finding for clear error and find none. *Id.*[9] PISD satisfied *Daniel R.R.* step one by considering whether R.H.'s IEP could be satisfactorily implemented in a regular classroom.

We disagree, moreover, with R.H.'s rigid interpretation of *Daniel R.R.* step one, because he ignores an important factual distinction. In *Daniel R.R.*, the district had the option of placing the child in either of two pre-existing public classrooms: a regular pre-kindergarten class or a special education early childhood class. *Daniel R.R.*, 874 F.2d at 1039. R.H. asserts that "PISD offers no main-

---

[8] *See* Hearing Transcript 150-53, 224-25.

[9] R.H. argues that the clear-error standard of review is "not as heavy" here, because we stand in the same shoes as did the district court in reviewing the administrative record. *See Sicula Oceanica v. Wilmar Marine Eng'g & Sales Corp.*, 413 F.2d 1332, 1333 (5th Cir. 1969). The distinction is irrelevant, however, because, as our analysis above should make apparent, we would uphold the district court's finding that PISD satisfied *Daniel R.R.* step one even under a more stringent review.

stream public classes for preschool children." In such a case, he argues, PISD was required to begin with the presumption that it would place him in "[t]he only mainstream placement available," a "'private' placement at a preschool for typically developing children," and remove him from the private setting only if it could not provide a satisfactory education there.

The IDEA, however, makes removal to a private school placement the exception, not the default. The statute was designed primarily to bring disabled students into the public educational system and ensure them a free appropriate *public* education.[10] Courts should therefore be cautious before holding that a school district is required to place a child outside the available range of public options.

We do not read *Daniel R.R.* to flip the default of the IDEA in favor of a private school placement in this case. *Daniel R.R.* does not consider or speak to the circumstances at issue here, where the public preschool curriculum does not include a purely mainstream class. Since *Daniel R.R.* was decided, none of our decisions involving LRE analysis addressed facts remotely similar to those in this case.[11] A rigid application of *Daniel R.R.* step one, therefore, is not as helpful or persuasive as R.H. contends.

R.H. hangs his LRE argument on a threshold challenge to *Daniel R.R.* step one and has not advanced an alternative argument that PISD failed step two.

---

[10] 20 U.S.C. § 1400(c)(2)(B) (finding that disabled children were being "excluded entirely from the public school system and from being educated with their peers"); *W.S. ex rel. C.S. v. Rye City Sch. Dist.*, 454 F. Supp. 2d 134, 148 (S.D.N.Y. 2006) ("Nothing in IDEA compels the school district to look for private school options if the [district], having identified the services needed by the child, concludes that those services can be provided by the public school.").

[11] *See V.P.*, 582 F.3d at 586 (concluding that mainstream placement for hearing-impaired child did not provide a FAPE under the circumstances presented there); *Brillon*, 100 F. App'x at 311-15 (stating that removing a second-grader from mainstream social studies and science classes because he could not keep pace with the curriculum did not violated the LRE requirement).

Accordingly, we affirm the district court's finding that R.H. was mainstreamed to the maximum extent appropriate, and R.H. has not met his burden under *Michael F.* factor two to show that his IEP was not implemented in the least restrictive environment.

4. *Michael F.* Factor Four: Academic and Non-academic Benefits.

We move to the fourth factor under *Michael F.*, whether R.H. demonstrated positive academic and non-academic benefits under his IEP. Here again, we agree with the district court that the record has evidence that R.H. made sufficient progress during his one semester at Beaty to show that his IEP was providing a FAPE. R.H.'s teacher testified at the due process hearing, for instance, that R.H. had made progress in a number of areas, including shape recognition, counting, responding to his name, and socializing with other students.

According to R.H.'s parents, he was happier and developing better at TLC than at Beaty. As we have already explained, however, the IDEA does not entitle R.H. to a program that maximizes his potential. *Michael Z.*, 580 F.3d at 292. As long as PISD has provided R.H. with a "basic floor" of opportunity, "specifically designed to meet the child's unique needs, supported by services that will permit him to benefit from the instruction," the district has fulfilled its obligations under the law. *Id.*

C. R.H.'s Placement at Beaty Did Not Violate the IDEA.

In summary, R.H. has not shown that PISD violated the procedural requirements of the IDEA, nor has he shown that his IEP was not reasonably calculated to enable him to receive educational benefits. It follows that the IEP's placement of R.H. at Beaty was not inappropriate under the IDEA, and R.H. is not entitled to tuition reimbursement for his time at TLC. We need not and do not decide, therefore, whether TLC's school-year curriculum offered a proper

No. 09-40369

private placement under the IDEA.

### V. Tuition Reimbursement for Summer 2005.

In addition to normal school-year tuition reimbursement, R.H. seeks reimbursement for summer enrollment at TLC in 2005. As explained above, we analyze requests for reimbursement by asking first, whether the IEP's placement (or in this case, lack thereof) was appropriate under the IDEA, and second, whether the private school placement at TLC was proper under the statute. *Michael Z.*, 580 F.3d at 293.

The hearing officer held that PISD violated the IDEA when it failed to respond to the request of R.H.'s parents that the district provide an extended school year for R.H. in the summer of 2005. Nevertheless, the hearing officer held that reimbursement for R.H.'s enrollment at TLC that summer was inappropriate because R.H. had not given notice to PISD that he would be enrolled at TLC during that time period, as required by 20 U.S.C. § 1412(a)(10)(C)(iii). That part of the statute provides, in relevant part, that a court or hearing officer may reduce or deny an otherwise valid reimbursement request if

> at the most recent IEP meeting that the parents attended prior to removal of the child from the public school, the parents did not inform the IEP Team that they were rejecting the placement proposed by the public agency to provide a free appropriate public education to their child, including stating their concerns and their intent to enroll their child in a private school at public expense; or . . . 10 business days . . . prior to the removal of the child from the public school, the parents did not give written notice to the public agency of the information described [above].

20 U.S.C. § 1412(a)(10)(C)(iii)(I). The district court affirmed the denial of reimbursement.

On appeal, R.H. argues, as he did before the district court, that the notice requirement did not apply to him, because PISD never organized an ARD meet-

16

ing specifically to address his request for an extended school year in 2005. He could not have possibly rejected the placement proposed by PISD per the notice requirement, when there was no summer placement proposal to reject in the first place.

We agree, instead, with the district court that the lack of extended school year services was part and parcel of R.H.'s IEP at the time he re-enrolled at TLC in May 2005, and he was thus required to give notice to PISD of his intent to reject the terms of his existing IEP. We note, moreover, that the decision to award private tuition reimbursement is a matter left to the discretion of courts and hearing officers.[12]

And even if we were convinced by R.H.'s argument that he was not required to give notice of enrollment at TLC for the summer of 2005, we are skeptical that he has met his burden to show that TLC was an appropriate private placement, worthy of reimbursement. The record reflects that TLC's regular curriculum ended in May 2005 and that the summer program was mere "play time."

## VI. Conclusion.

PISD satisfied its obligations under the IDEA to develop an IEP for R.H. that offered him a FAPE during the school year. R.H. is barred from receiving reimbursement for private summer preschool tuition, because he did not give proper notice. R.H.'s request for attorney's fees is denied.

There is no error. The judgment is AFFIRMED.

---

[12] 20 U.S.C. § 1412(a)(10)(C)(ii) (stating that "a court or a hearing officer *may* require the [school district] to reimburse the parents for the cost of [private] enrollment if the court or hearing officer finds that the agency had not made a free appropriate public education available") (emphasis added).

17