**C.H., a minor child, by next friends C.H. and G.H., Plaintiffs,**

v.

**NORTHWEST INDEPENDENT SCHOOL DISTRICT, Defendant.**

**Civil Action No. 4:09–cv–117.**

United States District Court, E.D. Texas, Sherman Division.

Sept. 30, 2011.

Myrna Bernice Silver, Myrna B. Silver, Attorney at Law, Dallas, TX, for Plaintiffs.

William M. Buechler, Cynthia Schwartz Buechler, Buechler & Associates, Austin, TX, for Defendant.

## *MEMORANDUM OPINION AND ORDER DENYING THE PLAINTIFFS' MOTION FOR JUDGMENT ON THE RECORD AND GRANTING THE DISTRICT'S MOTION FOR JUDGMENT ON THE RECORD*

RICHARD A. SCHELL, District Judge.

Before the court is an appeal from the decision of a Texas Education Agency (TEA) special education hearing officer. The Plaintiffs, the parents of C.H., a child diagnosed with dyslexia, Attention Deficit Hyperactivity Disorder (ADHD) and a speech impairment, filed a due process hearing request with the TEA, complaining that Northwest Independent School District (the District) denied C.H. a free and appropriate public education (FAPE) and requesting various forms of relief, including placement in a private school. After a three day hearing on the matter, a TEA hearing officer found for the District and denied the Plaintiffs' requests for relief. Thereafter, the Plaintiffs filed this suit, appealing the decision of the hearing officer. Both parties have filed motions for judgment on the administrative record. *See* Dkt. 28 (District's motion); Dkt. 30 (the Plaintiffs' motion). As will be explained below, the court finds that the Plaintiffs' motion should be denied and the District's motion granted.

## I. Background

The Individuals with Disabilities Education Act (IDEA), 20 U.S.C. § 1401 *et seq.*, requires school districts receiving federal funds to implement procedures and policies that assure that disabled students receive a FAPE. 20 U.S.C. §§ 1412(a)(1), 1415(a). To ensure that a student receives a FAPE, parents and school districts collaborate to develop an Individualized Education Plan (IEP) that is "reasonably calculated to enable the child to receive educational benefits." *R.H. v. Plano Indep. Sch. Dist.*, 607 F.3d 1003, 1008 (5th Cir.2010) (quotation and citation omitted). In Texas, the committee responsible for preparing an IEP is known as an Admissions, Review, and Dismissal Committee (ARDC).

C.H. enrolled as a second grade student in the District at the beginning of the 2004–2005 school year. Prior to that time C.H. attended school in California, where he had been identified as having ADHD and a speech impairment. Administrative Record (AR) pgs. 4784–95. On August 13, 2004, the District conducted an ARDC meeting to process C.H.'s transfer into the District. At this initial meeting, the com-

mittee established a temporary schedule of special education services for C.H., and the District received consent from C.H.'s parents to conduct a Full Individual Evaluation (FIE) of C.H. Thirty days later, on September 13, 2004, the ARDC met again and the District adopted a special education evaluation of C.H. that had been conducted nine months earlier by C.H.'s California school district.[1] Consistent with the California evaluation, the District identified C.H. as eligible for special education services due to his ADHD and speech impairment and scheduled him for special education services in language arts, content mastery and speech therapy. AR pg. 4753.

At a February 16, 2005 ARDC meeting, the committee decided that the District would conduct a FIE of C.H. The FIE was conducted on May 19, 2005, and reviewed at an ARDC meeting on May 25, 2005. The District found that the evaluation results were inconclusive as to whether C.H. suffered from a learning disability such as dyslexia (in addition to having ADHD).

In November of 2005, C.H. was evaluated privately at the Scottish Rite Hospital, and an ARDC meeting was held on January 3, 2006, to discuss the results of the Scottish Rite evaluation. The evaluation diagnosed C.H. with dyslexia and recommended that the District provide C.H. with a reading program for children with developmental dyslexia. AR pg. 985. The District adopted the Scottish Rite evaluation, and C.H. was placed in the District's Reading Attainment Program (RAP) for the 2006 spring semester. The RAP dyslexia program was discontinued before the 2006 fall semester began. At an ARDC meet-

ing on August, 28, 2006, the District gave the Plaintiffs two options for replacing his participation in the discontinued RAP program, and the Plaintiffs elected for C.H. to receive a daily dyslexia curriculum one-on-one with a reading specialist.

At the August 28, 2006 ARDC meeting it was also decided that C.H.'s speech therapy would be reduced at the recommendation of his speech therapist. Then, on December 4, 2006, the District conducted an updated language assessment of C.H. See AR pgs. 4583–88. The assessment was discussed at an ARDC meeting on December 11, 2006, however no changes were made to C.H.'s speech regimen as a result of the updated assessment.

In March of 2007, C.H. was accepted for the following school year into the Hill School, a private school in Grapevine, Texas, Tr. Vol. I pgs. 251–52, and he enrolled in the Hill School the following month, id. at 252. Despite his enrollment in the Hill School, however, C.H. continued to attend school in the District.

At the request of the parents, the ARDC met on May 4, 2007. Both parents attended the meeting and they were accompanied by two advocates. In addition to requesting various documents from the District pertaining to C.H., the parents expressed their concern that C.H.'s dyslexia had not been adequately addressed by the District and that the District had not provided him with a FAPE. AR pg. 4522. The parents requested that the District pay for C.H. to attend the Hill School in exchange for denying him a FAPE for three years. Id. at 4523. The ARDC

---

1. The District's adoption of the California evaluation is made evident by the documentation of the September 13, 2004 ARDC meeting. The committee minutes for that meeting states that the District "[w]ill take district assessments," AR pg. 4754, and it is else-

where noted that the District would "continue to rely on previous evaluation eligibility, continue current placement/IEP," AR pg. 4730, and that "additional evaluation data [was not] needed," AR pg. 4734.

reconvened on August 27, 2007, but the parents did not attend the meeting. C.H. was officially withdrawn from the District on the same day.

Except for the August 27, 2007 ARDC meeting, at least one of C.H.'s parents attended every ARDC meeting held while C.H. was enrolled in the District. Tr. Vol. II pg. 277. And according to testimony from the due process hearing, the parent who attended the ARDC meetings actively participated in them. Tr. Vol. III pg. 77.

Under the IDEA, the parents of a disabled child may file a complaint "with respect to any matter relating to the identification, evaluation, or education placement of the child, or the provision of a free appropriate public education [FAPE] to such child." 20 U.S.C. § 1415(b)(6). On July 12, 2007, the parents filed a request for a due process hearing with the TEA, see AR pgs. 894–98, and a hearing was held on September 24–26, 2008. On December 12, 2008, the hearing officer issued her decision, finding that C.H. had not been denied a FAPE and denying C.H.'s requests for relief. See AR pgs. 6–23.

Under 20 U.S.C. § 1415(i)(2),

Any party aggrieved by the findings and decision made under subsection (f) or (k) who does not have the right to an appeal under subsection (g), and any party aggrieved by the findings and decision made under this subsection, shall have the right to bring a civil action with respect to the complaint presented pursuant to this section, which action may be brought in any State court of competent jurisdiction or in a district court of the United States, without regard to the amount in controversy.

On March 12, 2009, the Plaintiffs filed this action under § 1415(i)(2), appealing the decision of the hearing officer.

## II. Standard of Review

■ "Under the IDEA, a federal district court's review of a state hearing officer's decision is virtually de novo.... The hearing officer's findings should be accorded due weight, but the district court must arrive at an independent conclusion based on a preponderance of the evidence." *Adam J. ex rel. Robert J. v. Keller Indep. Sch. Dist.*, 328 F.3d 804, 808 (5th Cir.2003) (internal quotations and citations omitted). Parties bringing an action under 20 U.S.C. § 1415(i)(2) may request that the court review evidence in addition to the administrative record; but when, as here, the parties make no such request, the court decides the case on the administrative record alone. *See* 20 U.S.C. § 1415(i)(2)(C).

■ The free and appropriate public education that is offered through an IEP "need not be the best possible one, nor one that will maximize the child's educational potential; rather, it need only be an education that is specifically designed to meet the child's unique needs, supported by services that will permit him to benefit from the instruction." *Adam J.*, 328 F.3d at 808 (quotation and citation omitted). This is because the IDEA "guarantees only a basic floor of opportunity, consisting of specialized instruction and related services which are individually designed to provide educational benefit." *Id.* (quotation and citation omitted). Yet the educational benefit conferred "cannot be a mere modicum or de minimis," rather it "must be meaningful and likely to produce progress." *Id.* at 808–09 (quotation and citation omitted).

■ "The role of the judiciary is not to second-guess the decisions of school officials or to substitute their plans for the education of disabled students with the court's. Instead, the court's role is limited to determining whether those officials have complied with the IDEA." *R.H. v. Plano Indep. Sch. Dist.*, 607 F.3d 1003, 1010 (5th

Cir.2010) (citation omitted). Accordingly, "[t]he IDEA creates a presumption in favor of a school district's educational plan, placing the burden of proof, by preponderance of the evidence, on the party challenging it." *Id.* at 1010–11.

■ "If the court finds that the state has not provided an appropriate educational placement, the court may require the school district to reimburse the child's parents for the costs of sending the child to an appropriate private school or institution. Reimbursement may be ordered only if it is shown that (1) an IEP calling for placement in a public school was inappropriate under the IDEA, and (2) the private school placement ... was proper under Act." *Houston Indep. Sch. Dist. v. V.P. ex rel. Juan P.*, 582 F.3d 576, 584 (5th Cir.2009) (citations and internal quotation omitted).

### III. Analysis

The Plaintiffs identify seven issues as the basis for their suit: (1) whether the statutory exceptions to the Texas one-year limitations period should apply in this case; (2) whether, following their written consent for a FIE in August of 2004, the District failed to evaluate C.H. until May, 2005; (3) whether the District failed to identify all areas of C.H.'s disabilities in that it failed to identify him with a learning disability in reading and written expression; (4) whether the District failed to timely provide C.H. with a dyslexia program, it discontinued the program without providing notice to them and provided a different, less effective dyslexia program for C.H.; (5) whether the District failed to timely evaluate C.H. for speech in that it did not evaluate him until December of 2006 and did so without requesting the parents' consent; (6) whether, following their requests for documentation personally identifiable to C.H., the District either failed to provide a complete set of copies or failed to allow the parents to review all requested documents; and (7) whether the District denied C.H. a FAPE from August of 2004 to the present date.

### A. Statute of Limitations

■ The statute of limitations for a parent or school district to file for a due process hearing under the IDEA is found in 20 U.S.C. § 1415(f)(3)(C):

A parent or agency shall request an impartial due process hearing within 2 years of the date the parent or agency knew or should have known about the alleged action that forms the basis of the complaint, or, if the State has an explicit time limitation for requesting such a hearing under this subchapter, in such time as the State law allows.

Texas has imposed its own time limitation with 19 Tex. Admin. Code. Ann. § 89.1151(c). Under that section a parent must request the hearing within one year of the date the parent knew or should have known of the alleged action that serves as the basis for the complaint.

There are two exceptions under 20 U.S.C. § 1415(f)(3)(D) that operate to toll the limitations provision:

The timeline described in subparagraph (C) shall not apply to a parent if the parent was prevented from requesting the hearing due to—

(i) specific misrepresentations by the local educational agency that it had resolved the problem forming the basis of the complaint; or

(ii) the local education agency's withholding of information from the parent that was required under this subchapter to be provided to the parent.

Because the Plaintiffs' claims found in issues (2) through (4) (as identified above) involved acts or omissions by the District prior to July 12, 2006 (one year before the

Plaintiffs' request for a due process hearing was filed), the hearing officer found that the claims were barred by the IDEA and Texas limitations provisions. The hearing officer also found the neither of the § 1415(f)(3)(D) exceptions prevented application of the limitations provisions. The Plaintiffs do not disagree with the hearing officer's findings as to which of their claims would be barred by normal operation of the limitations provisions. The Plaintiffs do disagree, however, with the officer's finding that neither of the § 1415(f)(3)(D) exceptions applied in this case.

█ Regarding the exception found in § 1415(f)(3)(D)(i) (the "misrepresentation exception"), the Plaintiffs argue that it applies because the District allegedly made the following misrepresentations:

(1) "[T]he District specifically misrepresented, upon the parent's inquiry, that only the principal and counselor were required at the initial Transfer ARD meeting that occurred on August 13, 2004, and this misrepresentation was admitted by the District in testimony," Dkt. 30, ¶ 64;

(2) "When C.H. entered the District in 2004, the District misrepresented to C.H.'s parent that they were at least temporarily putting in place the same special education services provided in California. However, the NISD services were not comparable to California's," Dkt. 30 ¶ 65;

(3) "When C.H. entered the District in August 2004, the District requested that the parent sign, and the parent did sign, consent for an evaluation. This request was a misrepresentation by the District, in that the request for consent implied that the District intended to timely evaluate C.H. However, no evaluation was done by the District until May, 2005, far

beyond the applicable 30–day timeline," Dkt. 30 ¶ 66;

(4) "The District' scribe misrepresented in the minutes ('deliberations') in ARD Document of 9/13/04 that C.H.'s parent was 'pleased with his progress,'" Dkt. 30 ¶ 67;

(5) "[T]he District misrepresented to the parent ... that C.H. had indeed qualified as a child with a learning disability based on the [May 2005] evaluation results. Instead, the District told his parent that the results were 'inconclusive' as to the existence of a learning disability because of the fact that he also had IDEA eligibility as a child with attention-deficit disorder ('ADD'). This is disingenuous: C.H.'s diagnosed ADD would have affected the scores on both his cognitive and achievement evaluations, so any discrepancy between the scores would not have been the result of the ADD, but could *only* point to a learning disability," Dkt. 30 ¶ 69; and

(6) "[W]hen C.H. was provided with the 'RAP' program in the spring semester of 2006 the District represented it as a 'Scottish Rite Dyslexia Program.' However, the evidence shows that this was a misrepresentation by the District: Although a 'Scottish Rite Dyslexia Program' exists, and it had been purchased about 6 years before C.H. was in the program, the teacher was not even aware of the existence of the videotapes of which the program consisted," Dkt. 30 ¶ 71.

As stated previously, the misrepresentation exception to the IDEA limitations provision applies only if the District made a "specific misrepresentation ... that it had resolved the problem forming the basis of the complaint." § 1415(f)(3)(D)(i). Thus, not just any misrepresentation by the District will trigger the exception; rather, the misrepresentation must be such that it

"prevent[s] [the parent] from requesting [a due process] hearing" regarding claims that would otherwise be time-barred. § 1415(f)(3)(D). For the following reasons, the court finds that none of misrepresentations alleged by the Plaintiffs fit that description.

The court first notes that the only alleged misrepresentations that are relevant to the IDEA misrepresentation exception are those that relate to the Plaintiffs' claims involving District conduct that occurred before July 12, 2006. This is because those are the claims that the limitation provision would ordinarily bar, were it not for the potential application of the § 1415(f)(3)(D) exceptions. Thus, the court finds of the alleged misrepresentations cited by the Plaintiffs (and numbered above), only the following are relevant: allegation number (3), because it relates to the Plaintiffs' claim that the District failed to evaluate C.H. until May, 2005; allegation number (5), because it relates to the Plaintiffs' claim that the District failed to identify C.H. with a learning disability in reading and written expression; and allegation number (6), because it relates to the Plaintiffs' claim that the District failed to timely provide C.H. with a dyslexia program, it discontinued the program without providing notice to the parent, and provided a different, less effective dyslexia program.

First, regarding allegation (3), the court cannot accept the Plaintiffs' argument that the District's request to evaluate C.H. constitutes a "specific misrepresentation" that it would evaluate him and do so immediately. Not only does this argument stretch the meaning of misrepresentation, the argument is refuted by several references in the September 13, 2004 ARDC meeting documentation which indicate the District's conclusion that no testing was presently needed due to the California school district's recent evaluation of C.H. *See supra* footnote 2. Furthermore, notwithstanding the District's request, as long as the parents were aware that C.H. had in fact not been tested—which, with at least one of them having attended every ARDC meeting, they must have been aware—they could have filed a timely request for a due process hearing on the matter.

Next, with allegation number (5), rather than being a misrepresentation that prevented the Plaintiffs from requesting a due process hearing, the court finds that the District's assessment of the May 2005 FIE as inconclusive about whether C.H. had a learning disability is merely the District's subjective and good-faith assessment of the test results. "In hindsight, [the Plaintiffs] might consider the District's assessment of [C.H.] to be wrong, but that does not rise to a specific misrepresentation" triggering § 1415(f)(3)(D)(i). *Sch. Dist. of Philadelphia v. Deborah A.*, No. 08–2924, 2009 WL 778321, at *4 (E.D.Pa. March 24, 2009). If inadequate assessments "were sufficient to warrant application of the statutory exception, the exception would swallow the rule." *Id.* Furthermore, while parties may "disagree over the diagnosis of a student's disability, '[t]he IDEA charges the school with developing an appropriate education, not with coming up with a proper label with which to describe [the child's] ... disabilities.'" *Klein Indep. Sch. Dist. v. Hovem,* 745 F.Supp.2d 700 (S.D.Tex.2010) (quoting *Heather S. v. Wisconsin,* 125 F.3d 1045, 1055 (7th Cir.1997)).

Finally, regarding allegation number (6), even if the District misrepresented its RAP program as a "Scottish Rite Dyslexia Program," such a representation would not have prevented the Plaintiffs from filing for a due process hearing regarding the separate matter of the District's alleged failure to timely provide a dyslexia pro-

gram, its discontinuance of the program without notifying the parents, and its provision of a different, less effective dyslexia program. Accordingly, the court finds that the hearing officer did not err in finding that the IDEA's misrepresentation exception did not apply here.

■ Regarding the exception found in § 1415(f)(3)(D)(ii) (the "withheld information exception"), C.H. argues that it applies because the District allegedly withheld the following:

> (1) "Although C.H.'s [May 2005] evaluation results clearly showed that there were significant discrepancies between cognitive ability and achievement in the areas of basic reading skills, reading comprehension, and written expression, the District ... withheld information from the parent, that C.H. had indeed qualified as a child with a learning disability based on the evaluation results," Dkt. 30, ¶ 68; and

> (2) "During the 2004–2005 school year, the District failed to provide C.H.'s parent with a full copy of this Texas Primary Reading Inventory ('TRPI') results, which showed that he was far behind his peers in reading," Dkt. 30, ¶ 69.[2]

The IDEA "withholding of information" exception, which is triggered when a school district withholds information "required [under IDEA] to be provided to the parent," § 1415(f)(3)(D)(ii), "addresses the IDEA requirement that school districts provide parents with a 'a copy of procedural safeguards.' " *El Paso Indep. Sch. Dist.*

*v. Richard R.*, 567 F.Supp.2d 918, 943 (W.D.Tex.2008). *See also Hooker v. Dallas Indep. Sch. Dist.*, No. 3:09–CV–0676–G–BH, 2011 WL 1592300, at *5 (N.D.Tex. March 31, 2011). The rationale for the exception is that "a local education agency's withholding of procedural safeguards would act to prevent parents from requesting a due process hearing ... until such a time as an intervening source apprised them of their rights." *Richard R.*, 567 F.Supp.2d at 945.

Because neither of the Plaintiff's withholding information allegations pertain to the District's failure to provide procedural safeguards, the court finds that the Plaintiffs have failed to show that the § 1415(f)(3)(D)(ii) exception applies. Accordingly, the court finds that the court finds that the hearing officer did not err in finding that IDEA's misrepresentation exception does not apply here.

For the foregoing reasons, the court concludes that the hearing officer correctly barred the Plaintiffs' claims regarding acts or omissions by the District prior to July 12, 2006. As a result of this finding, the court will not consider those claims in determining whether C.H. received a FAPE.

The court will now consider the Plaintiffs' three remaining issues, namely: whether the District failed to timely evaluate C.H. for a speech impairment in that it did not evaluate him until December of 2006 and did so without requesting parental consent; whether, following parental requests for documentation personally identifiable to C.H., the District either failed to provide a complete set of copies

**2.** In addition to these two allegations of the District withholding information, the Plaintiffs initially argued that "the District withheld information from the parent that it was required to provide when it did not give the parent a copy of the 'Procedural Safeguards' at the time of the initial transfer ARD meeting on August 13, 2004." Dkt. 30, ¶ 63. However-

er, the Plaintiffs later acknowledged that they did receive a copy of the procedural safeguards on that occasion. *See* Dkt. 39, ¶ 1. And this is confirmed in the record. AR pg. 1260. Therefore, the court will not address whether this particular allegation triggers the withholding exception to the limitations provisions.

or failed to allow the parents to review all requested documents; and whether the District denied C.H. a FAPE from July 12, 2006 until his withdrawal from the District in August of 2007.

## B. Speech Evaluation

■ The Plaintiffs make several allegations regarding the District's handling of C.H.'s speech impairment. First, they argue that the District failed to timely evaluate C.H. for a speech impairment in that he enrolled in the District in August 2004 but was not evaluated by the District until December of 2006. Further, the Plaintiffs argue that when the District finally did evaluate C.H., it used only one evaluation instrument to do so. The Plaintiffs argue that by using only one such instrument, the District violated 34 C.F.R. § 300.304(b)(2), which states that "[i]n conducting [an] evaluation, [a school district] must ... [n]ot use any single measure or assessment as the sole criterion for determining whether a child is a child with a disability and for determining and appropriate education program for the child." The Plaintiffs also argue that when the District evaluated C.H., it did so without first obtaining consent from them. Finally, the Plaintiffs fault the District for C.H.'s speech therapist's absence from ARDC meetings.

The hearing officer identified as one of eight "issues for decision in this case ... [w]hether the District failed to timely evaluate the child for a speech impairment in that it did not evaluate the child until December, 2006 and did do without requesting parental consent." AR pg. 7. However, the only speech-related matters on which she made a finding pertained to the speech evaluation without parental consent matter and the speech therapist not attending ARDC meetings matter. The court presumes that the hearing offi-

cer did not reach a finding on the timeliness of the evaluation because it involved alleged conduct, or lack thereof, that occurred prior to July 12, 2006, which, as discussed previously, is barred by the IDEA and Texas limitations provisions. The absence of the use of a single instrument for speech evaluation issue in the hearing officer's decision can be explained by the fact that the Plaintiffs did not raise the issue before the hearing officer. Because claims not raised before the hearing officer are not administratively exhausted, this court lacks jurisdiction to consider this allegation. *See supra* footnote 3.

With regard to the allegation that the District evaluated C.H.'s speech without parental consent, the hearing officer found that the District did indeed conduct the evaluation without prior written consent from a parent, in violation of 34 C.F.R. § 300.300 (requiring a school district to obtain parental consent before evaluating or providing services to a child). However, the hearing officer found that "there was no deprivation of educational benefits as a result of the evaluation without consent," explaining that the "Parent knew the assessment had been requested, freely signed consent 'after the fact, and participated in both the ARDC meeting when the assessment was requested and the meeting that reviewed the results.'" AR pg. 17. The court agrees with the hearing officer's findings.

The record demonstrates the following: The District's speech therapist who worked with C.H. testified at the due process hearing that in August of 2006 she had a phone conversation with C.H.'s mother in which she told the mother that she wanted to do an updated, formal speech assessment of C.H., and that the mother orally agreed to the assessment. Tr. Vol. II pgs. 109, 131–32. In addition, the documentation for the August 26, 2006

ARDC meeting references the need for an updated speech assessment. AR pgs. 4590, 4616, 4618. The speech evaluation was completed on December 4, 2006. AR pgs. 4583–88. The evaluation was reviewed at the December 11, 2006 ARDC meeting, at which time C.H.'s mother signed a form consenting to the previously conducted evaluation. AR pgs. 4581–82, 4963–65.

The federal regulations implementing the IDEA require that a school district "proposing to conduct an initial evaluation to determine if a child qualifies as a child with a disability ... must, after providing notice ..., obtain informed consent ... from the parent of the child before conducting the evaluation." 34 C.F.R. § 300.300(a)(1)(i). Clearly, as found by the hearing officer, the District failed to comply with this regulation. However, under 34 C.F.R. § 300.513(a)(2),

> In matters alleging a procedural violation, a hearing officer may find that a child did not receive a FAPE only if the procedural inadequacies (i) Impeded the child's right to a FAPE; (ii) Significantly impeded the parent's opportunity to participate in the decision-making process regarding the provision of a FAPE to the parent's child; or (iii) Caused a deprivation of educational benefit.

The court finds that the District's tardy request for written consent to evaluate did not result in any of the events just described. Accordingly, the court finds that the hearing officer was correct to reject this as a ground for C.H. not receiving a FAPE.

Finally, with regard to the allegation that the speech therapist did not attend ARDC meetings, the hearing officer found that the IDEA "does not include a speech pathologist among the required team members. A speech pathologist may be in attendance at the discretion of a parent or a district." AR pg. 19. In support of this finding, the hearing officer cited 20 U.S.C. § 1414(d)(1)(B), which lists the individuals that comprise an IEP team.[3] The court agrees with the hearing officer that the speech therapist was not a required IEP team member under the statute, but rather was someone who could participate "at the discretion of the parent or the agency [because she was an individual with] knowledge or special expertise regarding the child...." 20 U.S.C. § 1414(d)(1)(B)(vi). Further, even if, *arguendo*, the speech therapist were required to attend all the ARDC meetings, the Plaintiffs have not shown that her absence (i) impeded C.H.'s right to a FAPE; (ii) significantly impeded the parents' opportunity to participate in the decision-making process regarding the provision of a FAPE to C.H.; or (iii) caused a deprivation of educational benefit. 34 C.F.R. § 300.513(a)(2); *see supra.* Therefore, the court finds that the hearing officer was correct to reject this as a ground for C.H. not receiving a FAPE.

## C. Requested Documents

■ The Plaintiffs allege that the records kept by the District pertaining to C.H. "were a complete shambles and had

---

**3.** The Fifth Circuit has explained 20 U.S.C. § 1414(d)(1)(B) this way: "The IEP Committee includes the parents of the child with a disability, at least one of the child's regular education teachers, at least one special education teacher, a qualified representative of the school district (the local educational agency), an individual who can interpret "the instructional implications of evaluation results," other individuals who have knowledge or special expertise regarding the child (included at the discretion of the parent or agency), and, when appropriate, the child with a disability." *Houston Indep. Sch. Dist. v. V.P. ex rel. Juan P.,* 582 F.3d 576, 580 n. 1 (5th Cir.2009) (citing 20 U.S.C. § 1414(d)(1)(B)).

been altered." Dkt. 30, pg. 29. The hearing officer concluded that while the "[t]he District's document maintenance was less than organized," the irregularities cited by the Plaintiffs were nothing more than the District's attempts to correct mistakes. AR pg. 17. The hearing officer also found that any trouble the Plaintiffs may have had in recovering documents from the District could not have impeded the parent's decision-making regarding the District's provision of a FAPE to C.H. because the parents did not request any documents until the end of the 2006–2007 school year and just a few months before C.H. was withdrawn from the District.

In response, the Plaintiffs argue that the hearing officer "failed to appreciate" that, because the District had a responsibility to regularly provide documents to the parents before any documents were actually requested by the parents, if "the documents the parents received (or failed to receive) were anything like those viewed at the time of discovery ... then the documents provided to C.H.'s parents denied him a FAPE." Dkt. 30, pg. 29. However, because the Plaintiffs offer no evidence that documents provided to them at earlier dates were somehow inadequate, relying instead on speculation as to what might have occurred, the court cannot say that C.H.'s receipt of a FAPE was affected by the way the District provided documents. Accordingly, the court finds that the hearing officer was correct to reject this as a ground for C.H. not receiving a FAPE.

**D. Denial of FAPE**

The hearing officer found that C.H.'s educational program was appropriate and that the District did not deny him a FAPE. The Plaintiffs challenge this finding.

▉ Courts in this circuit consider the following four factors when reviewing whether an IEP is reasonably calculated to provide a meaningful educational benefit under the IDEA: (1) whether the program is individualized on the basis of the student's assessment and performance; (2) whether the program is administered in the least restrictive environment; (3) whether the services are provided in a coordinated and collaborative manner by the key stakeholders; and (4) whether positive academic and nonacademic benefits are demonstrated. *Houston Indep. Sch. Dist. v. V.P. ex rel. Juan P.*, 582 F.3d 576, 584 (5th Cir.2009). Having already found that the IDEA and Texas limitations provisions bar the Plaintiff's claims based on the District's conduct prior to July 12, 2006, the court's analysis, like the hearing officer's, is limited to the time period starting that date and ending in August of 2007, when C.H. left the District.

**1. Individualized program on the basis of C.H.'s assessment and performance.**

▉ The Plaintiffs allege that his educational program was not individualized because it was based on insufficient evaluations and an inaccurate assessment of C.H.'s FIE. The Plaintiffs also argue that he "was never provided with an appropriate program that would address his learning disabilities in reading and written expression .... [and] there is no documentation that despite the fact that speech services were consistently listed on C.H.'s IEP, he actually received any services." Dkt. 30, pg. 31.

With regard to these matters, the evidence in the record includes the following: At the ARDC meeting on August 28, 2006, the committee discussed the District's decision to discontinue the RAP dyslexia program in which C.H. had participated in during the 2006 spring semester. C.H. had been put in the RAP program in Janu-

ary of 2006 when the District accepted a Scottish Rite Hospital diagnosis of C.H. as having dyslexia. To replace the discontinued RAP program, the District offered to administer the RAP program to C.H. by tape, with assistance from a paraprofessional, or he could receive instruction from a reading specialist with whom C.H. had previously worked. The parents chose instruction from the reading specialist. The reading specialist testified that the instruction she provided to C.H. during the 2006–2007 school year was "one on one." Tr. Vol. III pg. 71. The instruction took place each school day for ninety minutes in reading and seventy-five minutes in math. The same regimen for instruction was reaffirmed at the December 11, 2006 ARDC meeting.

As mentioned above, C.H.'s speech therapist testified that prior to the August 26, 2006 ARDC meeting she called C.H.'s mother and spoke with her about C.H.'s progress and about her recommendations for service during the 2006–2007 school year. The speech therapist also testified that she told C.H.'s mother that she wanted to do an updated, formal speech assessment of C.H., and that the mother was in agreement with this proposal. At this meeting it was also decided, at the request of the speech therapist, that C.H.'s speech services would be reduced from ten thirty-minute sessions per six weeks, which had been his speech regimen since he first enrolled in the District, AR pg. 4733, to five thirty-minute sessions per six weeks. AR pg. 4615; Tr. Vol. III, pgs. 214–15. The speech therapist testified that she reduced the amount of speech services due to C.H.'s mastery of certain objectives during the previous year. Tr. Vol. II pg. 108. The speech therapist also testified that the amount of therapy C.H. actually received from her exceeded what was listed in the IEP documents. Tr. Vol. II pg. 128.

A language assessment was performed on December 4, 2006. The results of the assessment were reviewed at the Dec. 11, 2006 ARDC meeting, at which time the ARDC elected to continue with C.H.'s speech services as set at the August 2006 ARDC meeting. AR pgs. 4580–81. At the May 14, 2007 ARDC meeting, the parents requested that C.H. not receive speech services through the end of the school year. AR pg. 4527. While the Plaintiffs allege that C.H. may not have received his scheduled speech services, they have produced no evidence in support of that allegation.

While the Plaintiffs may dispute the quality of the methodology employed by the District, the court finds that the education program it provided C.H. from July 12, 2006, to when he withdrew in August of 2007 was sufficiently individualized. Consequently, this factor weighs in favor of the hearing officer's decision.

## 2. Program administered in the least restrictive environment.

During the 2006–2007 school year, C.H. received special education in his areas of need (language arts, speech and math), whereas he received a general education instruction in all other subjects. The Plaintiffs argue that C.H.'s educational environment should have been more restrictive, i.e. he needed smaller classes and more individualized attention. However, as shown above, and as a result of the parents' choice, for the 2006–2007 school year C.H. received one-on-one instruction from a reading specialist in an effort to address his dyslexia. The record also suggests that his speech services were provided to him on an individual basis. In his areas of need, it is unclear how the environment in which the District worked with C.H. could have been more restrictive.

The court finds that this factor weighs in favor of the hearing officer's decision.

### 3. Coordinated and collaborative services provided by key stakeholders.

The Plaintiffs argue that "[t]his [coordinated and collaborative services by key stakeholders] clearly did not occur. At every opportunity, the District misrepresented and/or withheld information from [his] parents." Dkt. 30, pg. 32. However, of the Plaintiffs' allegations relating to this point, only two could have occurred within the relevant time period. The first is that the "school records that were provided to [C.H.'s mother] were altered and that some were withheld entirely, even after the District was ordered to provide documents pursuant to an order compelling production of documents." Dkt. 30, pg. 32. The court is left to presume that by this statement the Plaintiffs are referring to when in April and May of 2007 they requested and received C.H.'s records from the District. *See* AR pg. 4500. However, because this allegation pertains to the Plaintiffs' objections regarding how the District maintained and delivered C.H.'s records, and not whether services provided to him were "coordinated and collaborative" and "provided by key stakeholders," the court finds this allegation unavailing.

The second allegation is that when the District discontinued the RAP dyslexia program in which C.H. had participated during the 2006 spring semester, the District "never divulged [their decision to discontinue the program] to his parents, who found out about the change from other parents." Dkt. 30, pg. 33. The court understands the Plaintiffs' frustration with how they were informed of the RAP program's discontinuation. As key stakeholders in the services being provided to C.H.,

the Plaintiffs should have been informed as soon as the District decided to discontinue the program. Nevertheless, following the program's discontinuation the parents were given two options for replacing the program, and there was little, if any, interruption in the District's provision of dyslexia services to C.H. Therefore, the court finds that this alleged incident does not indicate that the services provided to C.H. were not "coordinated and collaborative . . . by key stakeholders."

### 4. Demonstration of positive academic and non-academic benefits.

With regard to academic and non-academic benefits, the documentary evidence includes the following: The minutes for the August 28, 2006 ARDC meeting, which took place at the beginning of C.H.'s fourth grade year, note that "parents and teachers alike expressed that C.H. had made great strides in the past year. Presnt [sic] levels of education performance indicate that [C.H.] is working on ending first grade/beginning second grade level in both reading and math." AR pg. 4616. The minutes for the December, 11, 2006 ARDC meeting note that C.H.'s "[p]resent levels of academic performance and functional performance indicate that [he] is on a first grade level in reading and a third grade level in math." AR pg. 4581. In a conference held on February 26, 2007, between C.H.'s mother, his special education teacher, and the school counselor, the mother expressed her concern about C.H.'s behavior but also reported that there had been "a great improvement in [C.H.'s] reading." AR pg. 4541; Tr. Vol. III pgs. 79–80. C.H.'s scores from the Texas State–Developed Alternative Assessment II (SDAA) in the spring of 2006 showed that he had mastered only first grade instructional level material in read-

ing and math. AR pgs. 4630–31.[4] When C.H. took the same test one year later, in the spring of 2007, it showed that he had mastered second grade instructional level material in reading and math, and that his scores met the individual performance standard established by his ARDC. AR pgs. 4537–38. The Plaintiffs disputed the validity of the SDAA tests, arguing that the District did not follow protocol in providing C.H. with test-taking accommodations. AR pgs. 1235–36.

Additionally, the testimonial evidence includes the following: C.H.'s mother testified at the due process hearing that C.H. regressed academically during his time in the District, and that during the spring semester of the 2006–2007 school year, his last semester in the District, his behavior became a problem, Tr. Vol. II is pgs. 235–36. The Plaintiffs' expert, Dr. Zerfas, also testified that C.H. regressed during his time in the District. Tr. Vol. I pg. 323. The District offered expert testimony that Dr. Zerfas's evaluation of C.H. was unreliable. Tr. Vol. III pgs. 244–50. District personnel that worked with C.H. testified that he was progressing academically while in the District, and that C.H.'s overall demeanor at the end of the 2006–2007 school year was "fun, happy" and that he was a "typical fourth grader," Tr. Vol. III pg. 259, 268.

The record is conflicting regarding C.H.'s progress during the 2006–2007 school year. Due to its independence from the parties in this case, the most reliable indicator is probably the SDAA test, which suggests that C.H. did make progress. Regardless, the court finds that the Plaintiffs have not shown by a preponderance of the evidence that C.H. did not progress during the relevant time period.

Thus, examining the evidence in the record using the four factors recognized by the Fifth Circuit, the court finds that the Plaintiffs have not shown that the District denied C.H. a FAPE during the relevant time period (the 2006–2007 school year).

## IV. Conclusion

Having rejected all of the Plaintiffs' arguments in support of their motion for judgment on the record (Dkt. 30), the court finds it appropriate to **DENY** the motion. And because it is the Plaintiffs' burden to show that C.H. was denied a FAPE, and the court has found that they have failed to carry that burden, the court finds that the District's motion for judgment on the record (Dkt. 28) should be **GRANTED**. Accordingly, the decision of the hearing officer is hereby **AFFIRMED**.

Finally, the District has requested attorneys' fees. In relevant part, the IDEA permits a court in its discretion to award reasonable attorneys' fees in the following circumstances:

> [T]o a prevailing party who is a State educational agency or local educational agency against the attorney of a parent who files a complaint or subsequent cause of action that is frivolous, unreasonable, or without foundation, or against the attorney of a parent who continued to litigate after the litigation clearly became frivolous, unreasonable, or without foundation;
>
> or to a prevailing State educational agency or local educational agency against the attorney of a parent, or against the parent, if the parent's complaint or subsequent cause of action was presented for any improper purpose, such as to harass, to cause unnecessary

---

**4.** The SDAA is a test developed by the State of Texas for students in special education as an alternative to the Texas Assessment of Knowledge and Skills (TAKS) test. The test is scored by the state, not by individual school districts. Tr. Vol. III, pgs. 30–31.

delay, or to needlessly increase the cost of litigation.

20 U.S.C. § 1415(i)(3)(B)(i)(II)-(III). The District has not shown, nor does the court find, that any of these events occurred in this case. Accordingly, the District's request for attorneys' fees is **DENIED.**

**IT IS SO ORDERED.**